Thomas J. BROWN, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CM–251.

District of Columbia Court of Appeals.

Argued Feb. 5, 1993.
Decided June 24, 1993.

Gloria Johnson, appointed by the court, for appellant.

1. D.C.Code § 33–541(d) (1988).

Barbara K. Bracher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Martin D. Carpenter, Asst. U.S. Attys., were on the brief, for appellee.

Before TERRY, SCHWELB, and SULLIVAN, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted of possession of cocaine[1] and possession of drug paraphernalia.[2] He contends on appeal that the trial court erroneously (1) denied his motion to suppress the cocaine and the crack pipe that were taken from him when he was arrested, (2) rejected his challenge to the composition of the jury, (3) refused to compel the government to produce the chemist who analyzed the drugs, and (4) declined to tell the jury that the court, rather than the jury, would decide the paraphernalia count. We find no merit in any of these contentions and accordingly affirm appellant's convictions.

I

On April 30, 1991, Officer James King of the Metropolitan Police and Agent James Cook of the United States Bureau of Alcohol, Tobacco, and Firearms were on routine patrol in Southeast Washington. At approximately 4:00 a.m. they entered a two-story, four-unit apartment building on Wayne Place, S.E., "to do a routine check of the hallway" because they knew that it was frequented by drug users. The doors to the building had locks on them, but they were not locked, and the rear door was propped open. Officer King entered the building from the rear and walked up one flight of stairs to the first floor. As he started toward the second floor, he saw appellant Brown standing on the stairway landing just a few feet above him. In his right hand Brown was holding what King recognized as a pipe used for smoking crack cocaine. Officer King immediately placed him under arrest for possession of

2. D.C.Code § 33–603(a) (1988).

drug paraphernalia. A search incident to the arrest revealed a rock of crack cocaine in Brown's pants pocket, which King seized. The officer testified that Brown was "very disoriented" and had a "very strong odor of alcoholic beverages" about his person.

Brown testified that his home was only a short distance away. Earlier that night, he said, after an argument with his wife, he decided to go out because he "was tired of listening" to her quarreling. After walking for a while, he met several men (whom he did not know) on a street corner and started drinking beer with them. After a period of time, Brown and some of these men moved to the steps of the apartment building, and ultimately to the stairwell inside that building. Brown testified that his companions had left him alone in the stairwell only moments before the police arrived. Brown denied having a crack pipe in his hand when Officer King saw him. He claimed that the pipe was on the steps and that Officer King erroneously concluded that it belonged to him. He also said that the crack he was charged with possessing was seized by the police from the stairwell banister, not from his pants pocket.

## II

▆▆ Brown argues that the trial court erred in denying his motion to suppress the cocaine which the police seized from him upon his arrest. He reasons that the seizure was unlawful because the police entry into the apartment building was made without a warrant and because there were no circumstances that would have justified a warrantless entry. *See, e.g., United States v. Salvucci,* 448 U.S. 83, 86–87, 100 S.Ct. 2547, 2550, 65 L.Ed.2d 619 (1980); *United States v. Calandra,* 414 U.S. 338, 347, 94

S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). The Supreme Court, however, has made clear that the Fourth Amendment "protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Consequently, a defendant may not "invoke the force of the exclusionary rule ... merely on the basis that the Government conducted an illegal search or seizure." *United States v. Gerena,* 662 F.Supp. 1218, 1234 (D.Conn.1987) (citing *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)). Rather, application of the rule depends on whether "the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (citations omitted); *accord, e.g., Prophet v. United States,* 602 A.2d 1087, 1091 (D.C.1992); *Lewis v. United States,* 594 A.2d 542, 544 (D.C.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992); *Turner v. Fraternal Order of Police,* 500 A.2d 1005, 1007 (D.C. 1985); *United States v. Booth,* 455 A.2d 1351, 1353 (D.C.1983); *Moore v. United States,* 468 A.2d 1342, 1345 (D.C.1983). Thus, before we may consider whether the police violated the Fourth Amendment by entering the apartment building stairwell at 4:00 a.m. without a warrant, we must determine whether Brown had a legitimate expectation of privacy in that stairwell. We hold that he did not.

▆▆ The Supreme Court has declared that a person's "subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." *Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990) (citations and internal quotation marks omitted);[3] *see Rakas, supra,* 439 U.S. at

---

**3.** This formulation was slightly changed from the Court's earlier decisions. Previously, the Court had stated that the "legitimate expectation of privacy" inquiry

> normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy" ...—whether, in the words of the *Katz* majority, the individual has

shown that "he seeks to preserve [something] · as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable'" ...—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.

144 n. 12, 99 S.Ct. at 430–31 n. 12 ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society"). In deciding whether Brown's asserted expectation of privacy in the stairwell was reasonable, we must consider several factors, including whether he had authority to exclude others from the area entered and searched, whether he had access to and use of that area in the past, whether he took reasonable precautions to maintain privacy, how long he had been there, and whether there were other persons there with him. *See Prophet, supra,* 602 A.2d at 1087; *Booth, supra,* 455 A.2d at 1353; *United States v. Burnett,* 281 U.S.App.D.C. 428, 432, 890 F.2d 1233, 1237 (1989).[4] In addition, since the legitimacy of one's expectations of privacy may be determined in some cases "by reference to concepts of real and personal property law," *Rakas, supra,* 439 U.S. at 144 n. 12, 99 S.Ct. at 430–31 n. 12, we may also consider whether a defendant owns the premises or at least has a right of possession, alone or shared with others. *See Booth, supra,* 455 A.2d at 1353. The presence or absence of such property rights, however, is merely one more factor for us to consider, and no single factor is dispositive. *See, e.g., Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984); *Salvucci, supra,* 448 U.S. at 91, 100 S.Ct. at 2552–53 (property ownership not determinative); *Rawlings v. Kentucky,* 448 U.S.

98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980) (same).

■ Applying all these factors, we readily conclude that Brown had no legitimate expectation of privacy in the stairwell.[5] First, he was not a resident of the building, nor was he present at the invitation of any of its tenants. Thus the normal expectations of privacy enjoyed by homeowners (or renters), or even their overnight guests, are not implicated in this case. *See Lewis, supra,* 594 A.2d at 545–546. Second, Brown admitted that he had never even been in the apartment building before that evening, and thus he had no basis in prior experience from which to derive an expectation of privacy there. Moreover, he was in a part of the building utilized by residents and visitors for ingress to and egress from the individual apartments; hence common sense should have told him that he was not in a place which would afford him privacy. *See United States v. Anderson,* 175 U.S.App.D.C. 75, 79, 533 F.2d 1210, 1214 (1976) (no reasonable expectation of privacy in semi-public common area open to residents, their guests, and delivery persons); *cf. California v. Greenwood,* 486 U.S. 35, 40, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988) (leaving property where it is "readily accessible to animals, children, scavengers, snoops, and other members of the public" lessens reasonableness of claimed privacy expectation); *Katz, supra,* 389 U.S. at 351, 88 S.Ct. at 511 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection" (citations omitted)). Third, Brown made no

*Smith v. Maryland, supra,* 442 U.S. at 740, 99 S.Ct. at 2580 (citations omitted). The Court in *Olson* collapsed these two inquiries into one, no doubt because it had come to recognize that they "necessarily overlap. While it is true that the existence of a subjective privacy expectation is a prerequisite of 'reasonableness,' it is also true that reasonableness depends on a factual and legal evaluation of the basis for the subjective expectation. Thus it is not possible to entirely divorce inquiry under one prong of the test from inquiry under the other." *United States v. Gerena, supra,* 662 F.Supp. at 1235 n. 19.

4. Other courts have identified additional factors such as whether the person challenging the

search made use of the area as a residence or as a repository for personal belongings. *See, e.g., United States v. Gerena, supra,* 662 F.Supp. at 1253.

5. We note at the outset that the building in this case was not a rooming house, and that our cases involving rooming houses, such as *United States v. Booth, supra,* and *Bryant v. United States,* 599 A.2d 1107, 1109–1110 (D.C.1991), are therefore inapposite. Brown cannot claim the legitimate expectation of privacy that a tenant in a rooming house has in its hallway, which, unlike the stairwell in the instant case, is not open to the general public. *Booth, supra,* 455 A.2d at 1354.

effort to protect his privacy and did not even bother to close the rear door to the building, which had been propped open. Finally, Brown testified that he was accompanied in the building by other individuals who apparently came and went freely, suggesting that Brown possessed a greater interest in companionship than in solitude. *See Prophet, supra,* 602 A.2d at 1087; *United States v. Robinson,* 225 U.S.App. D.C. 282, 288, 698 F.2d 448, 454 (1983).

■ Brown relies heavily on this court's decision in *McGloin v. United States,* 232 A.2d 90 (1967), in which we said that a four-unit apartment house "is not a public or semi-public building." *Id.* at 91. Seizing on this language, Brown asserts that such a building's "private" status makes his expectation of privacy reasonable. We disagree. The quoted language must be read in light of the fact that *McGloin* was a prosecution for unlawful entry, in which the defendant had entered the building through a trap door in the roof after having been previously seen on the fire escape. Although we concluded that the evidence was sufficient to prove that loitering on the roof or the fire escape "would be against the will of the owner," we observed that, notwithstanding the building's non-public status, "a member of the public might lawfully enter the lobby or entrance hall for the purpose of making inquiry, making a delivery, or for some like purpose...." *Id.* Furthermore, once a location is acknowl-

edged to be open to the public, "it is pointless to exclude the police alone, for that 'would impede effective law enforcement while adding little to the individual's interest in privacy.' " *State v. Mooney,* 218 Conn. 85, 97, 588 A.2d 145, 153 (citation omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991); *see also United States v. Perkins,* 286 F.Supp. 259, 263 (D.D.C.1968), *aff'd,* 139 U.S.App.D.C. 179, 432 F.2d 612, *cert. denied,* 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970).

■ Viewing the totality of circumstances, no reasonable person could conclude that Brown had a subjective expectation of privacy in the stairwell. Even assuming that he had such a subjective expectation, we are convinced that it is not one which society is prepared to sustain as objectively reasonable. We therefore hold that Brown had no legitimate expectation of privacy in the apartment stairwell, and that his Fourth Amendment rights were not implicated by the warrantless entry into the building's common area by the police.[6]

### III

Brown also challenges the composition of the jury that heard his case. After the first witness (Officer King) had testified on direct examination, Brown for the first time expressed concern that the jury was not representative of his peers.[7] The trial

---

**6.** Our decision today is consistent with the weight of authority from other courts. *See, e.g., United States v. Concepcion,* 942 F.2d 1170, 1172 (7th Cir.1991) ("Indeed, it is odd to think of an expectation of 'privacy' in the entrances to a building. The vestibule and other common areas are used by postal carriers, custodians, and peddlers. The area outside one's door lacks anything like the privacy of the area inside"); *United States v. Burnett, supra,* 281 U.S.App.D.C. at 434, 890 F.2d at 1239; *United States v. Holland,* 755 F.2d 253, 255–256 (2d Cir.) (no expectation of privacy in common halls and lobbies of multi-tenant buildings) (collecting cases), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985); *United States v. Eisler,* 567 F.2d 814, 816 (8th Cir.1977); *United States v. Shima,* 545 F.2d 1026, 1029, *aff'd on reh'g en banc,* 560 F.2d 1287 (5th Cir.), *cert. denied,* 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed.2d 490 (1977); *State v. Brown,* 198 Conn. 348, 357, 503 A.2d 566, 570 (1986) (common areas generally);

*Commonwealth v. Hall,* 366 Mass. 790, 794, 323 N.E.2d 319, 322 (1975) (apartment building hallway); *State v. Eddy,* 519 A.2d 1137, 1141 (R.I. 1987) (apartment building hallway). At least two federal appellate courts have specifically declined to find a reasonable expectation of privacy in a building stairwell. *United States v. Dickens,* 695 F.2d 765, 778 (3d Cir.1982), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983); *United States v. Freeman,* 426 F.2d 1351, 1353 (9th Cir.1970).

**7.** The court took a short recess after King's direct testimony. After the recess, while the jury was still out of the courtroom, defense counsel said to the court, "My client feels that he is not being tried by a jury of his peers." The court asked, "Do you wish to expand upon that for the purposes of the record?", and Brown himself responded, "Well, Your Honor, I mean [the community is] about 70 percent African-

court interpreted Brown's objection as a claim that the jury did not represent a fair cross-section of the community, but found that there was no violation of his Sixth Amendment rights. We agree with the statement in the government's brief that Brown's claim "misconstrues the applicable law."

▇▇▇▇ Although the Sixth Amendment "guarantees that the petit jury will be selected from a pool of names representing a cross section of the community ... [it does not require] that 'petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.'" *Batson v. Kentucky,* 476 U.S. 79, 85–86 n. 6, 106 S.Ct. 1712, 1717 n. 6, 90 L.Ed.2d 69 (1986) (citations omitted); *see Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975); *Kingsbury v. United States,* 520 A.2d 686, 691 (D.C.1987); *Obregon v. United States,* 423 A.2d 200, 205–206 (D.C.1980), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981). "[A] defendant has no right to a 'petit jury composed in whole or in part of persons of his own race.'" *Batson, supra,* 476 U.S. at 85, 106 S.Ct. at 1717 (quoting *Strauder v. West Virginia,* 100 U.S. 303, 305, 25 L.Ed. 664 (1880)). Thus any defendant who claims a violation of the "fair cross-section" requirement must make a threefold *prima facie* showing:

[T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group *in venires from which juries are selected* is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri, supra,* 439 U.S. at 364, 99 S.Ct. at 668, (emphasis added), cited with approval in *Obregon v. United States, supra,* 423 A.2d at 205. Brown has not even attempted to make such a showing; therefore, his claim must fail. *See Kingsbury, supra,* 520 A.2d at 691; *Obregon, supra,* 423 A.2d at 205.[8]

▇▇▇▇ Brown also contends that his objection to the composition of the jury was based on the government's use of its peremptory challenges in a racially discriminatory, and therefore unconstitutional, manner.[9] *See Batson, supra,* 476 U.S. at 89, 106 S.Ct. at 1719; *see also Hernandez v. New York,* —— U.S. ——, —— - ——, 111 S.Ct. 1859, 1868–1869, 114 L.Ed.2d 395 (1991). Brown asserts that the trial court erred in failing to require the government to provide a racially neutral explanation for challenging black venire members. It is, of course, beyond dispute that constitutional principles of equal protection[10] forbid the

---

American, and the jury is probably about 80 percent Caucasian. I don't feel that these should be considered a jury of my peers. Not that they might not be partial [*sic*], but ... as I understand it, a jury of your peers will be people you work with or live [with] in the community."

**8.** It is also incumbent upon a defendant to raise this issue in a timely fashion. Brown's objection to the composition of the jury was not made until well after the jury had been seated and the testimony of the first witness was half over. We need not decide here exactly when the right to make such an objection expires. We note, however, that the Supreme Court has characterized as "sensible" a rule that objections to the racially discriminatory use of peremptory challenges based on *Batson v. Kentucky* must be made "in the period between the selection of the jurors and the administration of their oaths." *Ford v. Georgia,* 498 U.S. 411, 422, 111 S.Ct. 850,

857, 112 L.Ed.2d 935 (1991). *See also Clark v. Newport News Shipbuilding & Dry Dock Co.,* 937 F.2d 934, 940 (4th Cir.1991) (failure to raise *Batson* issue at trial forecloses claim of plain error on appeal).

**9.** We assume, without deciding, that Brown's statement to the court (see note 7, *supra* ) articulated this objection with sufficient precision to preserve the *Batson* issue for appellate review.

**10.** The holding in *Batson* was based on the Equal Protection Clause of the Fourteenth Amendment. Although that amendment is not applicable to the District of Columbia or the federal government, the principles underlying the Equal Protection Clause have been held to be incorporated into the Fifth Amendment, which of course is applicable. *See Bolling v. Sharpe,* 347 U.S. 497, 498–499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

striking of potential jurors solely on the basis of race. *E.g., Powers v. Ohio,* ——— U.S. ———, ——— – ———, 111 S.Ct. 1364, 1369–1370, 113 L.Ed.2d 411 (1991). However, as we have recently held under virtually identical circumstances, a defendant bears the burden of creating an adequate record to permit appellate review. In asserting a *Batson* violation, an appellant must present this court with a record "establish[ing] the racial makeup of either the venire or the jury actually selected." *Nelson v. United States,* 601 A.2d 582, 590 (D.C. 1991). No such record is before us in this case. Without it, we cannot decide whether there was or was not a *Batson* violation; consequently, in this case as in *Nelson,* we reject Brown's claim of error.[11]

## IV

Brown argues next that the trial court erred when it refused to compel the prosecutor, during his case in chief, to call the chemist from the Drug Enforcement Administration (DEA) who analyzed the cocaine. In accordance with D.C.Code § 33–556 (1988),[12] the court allowed the prosecutor to introduce the report prepared by the chemist during the testimony of a police detective. Defense counsel objected to the admission of this report, contending that he had a right to cross-examine the chemist during the government's case in chief. The court overruled the objection, concluding that the requirements of D.C.Code § 33–556 had been met. We find no error:

 As the trial court recognized, section 33–556 specifically authorizes the procedure followed in this case. There are four prerequisites for admission of a chemist's report under this statute:

(1) the "analysis of a controlled substance [must be] performed by a chemist charged with an official duty to perform such analysis," (2) an "official report of chain of custody and of analysis of [the] controlled substance" must be "attested to by that chemist," (3) the chemist's official report must be "attested to ... by the officer having legal custody of the report," and (4) the official report must be "accompanied by a certificate under seal that the officer has legal custody."

*Giles v. District of Columbia,* 548 A.2d 48, 53–54 (D.C.1988) (quoting D.C.Code § 33–556). In addition, since the report is hearsay, there must be evidence during the government's case in chief which establishes the applicability of the "business record" exception to the hearsay rule. *Id.* at 53. This is typically accomplished through foundational testimony by the "custodian, or conceivably someone else in a position to know ... that the report was made in the regular course of business, that the regular course of business included preparation of such a report, and that the report was made within a reasonable time after the analysis of the controlled substance." *Id.* (citations omitted). This court has held, and Brown concedes, that the purpose of the statute is not to thwart a defendant's

---

**11.** Brown also asserts in his brief that he "was not properly advised that if there was a showing that the prosecutor had challenged potential jurors solely on the basis of their race," his equal protection claim would have succeeded. It is unclear from this language whether he is criticizing his trial counsel or the court, but in either event this contention is without merit. A court has no obligation to advise a defendant, who is represented by counsel, when to interpose objections during the course of the trial. *See Clark, supra* note 8, 937 F.2d at 939 (court not obliged to raise *Batson* issue *sua sponte*). On the other hand, if Brown is claiming that his own trial counsel (he has new counsel on appeal) was ineffective for failing to make a proper *Batson* argument, he has not made the showing required by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**12.** D.C.Code § 33–556 provides in pertinent part:

In a proceeding for a violation of [the Controlled Substances Act], the official report of chain of custody and of analysis of a controlled substance performed by a chemist charged with an official duty to perform such analysis, when attested to by that chemist and by the officer having legal custody of the report and accompanied by a certificate under seal that the officer has legal custody, shall be admissible in evidence as evidence of the facts stated therein and the results of that analysis.... In the event that the defendant or his or her attorney subpoenas the chemist for examination, the subpoena shall be without fee or cost and the examination shall be as on cross-examination.

effort to challenge the validity of the government's evidence, but simply "to 'relieve ... chemist[s] from the requirement of making ... personal appearances' at trials where the results of chemical analyses are not in dispute." *Howard v. United States*, 473 A.2d 835, 838 (D.C.1984) (quoting legislative history).

Brown argues nevertheless that the court erred when it refused to require the government to produce the DEA chemist during its case in chief, instead of merely making him available during the defense case. Brown's principal argument is that the trial court's refusal to compel to the government to call the chemist during its own case forced him to choose between exercising two constitutional rights, namely, his Fifth Amendment right to put on no defense and his Sixth Amendment right to confront his accusers. Our case law compels us to hold otherwise.

■■■ This court has held that the procedure established under section 33–556 does not infringe any confrontation right enjoyed by defendants in criminal cases. *See Belton v. United States*, 580 A.2d 1289, 1293–1294 (D.C.1990); *Jones v. United States*, 548 A.2d 35, 47–48 (D.C.1988); *Howard v. United States, supra*, 473 A.2d at 838. "Despite the importance of confrontation and the basic rule against admission of hearsay testimony, it is, of course, well established that certain types of hearsay evidence are inherently reliable and therefore admissible as exceptions to the Confrontation Clause." *Id.* (citing, *e.g., Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)); *see also Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973) ("the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process"). Applying this standard, we

have specifically held that chemists' reports admitted under section 33–556 are "sufficiently trustworthy to satisfy the purpose of the Confrontation Clause." *Howard, supra*, 473 A.2d at 839.

■■■ Brown's Fifth Amendment claim fares no better. While it is true that section 33–556 theoretically forces him to present at least a defense in which the government chemist is called as a witness, he has failed to show that forcing him to call the chemist during his own case caused him any prejudice whatsoever.[13] Indeed, we rejected a similar Fifth Amendment claim in *Berry v. United States*, 528 A.2d 1209 (D.C.1987), holding that "the defense is not substantially disadvantaged by the government's failure to call the chemist in its case in chief." *Id.* at 1210 (D.C.1987) (citing *Howard, supra*). The enactment of section 33–556 merely altered the procedure for admitting chemists' reports. It did not change the substance of what is admissible, nor did it restrict a defendant's ability to test the validity of a chemist's report through cross-examination. We find no merit whatever in Brown's Fifth Amendment claim.

■■■ Brown makes an additional Fifth Amendment argument. He contends that the procedure established by section 33–556 violated his due process rights by shifting to him the burden of proof on the question of whether the substance found on his person was an illegal narcotic. This contention ignores two obvious facts. First, under section 33–556 the substance of the evidence provided by the chemist, *i.e.*, the identity and quantity of the contraband, is the same regardless of whether the chemist personally appears or merely submits a written report. Second, the timing of its introduction, *i.e.*, during the government's case in chief, is no different under section 33–556 from what it would be if that statute had never been enacted. It simply

---

**13.** Brown argues that he was prejudiced (1) by having to wait until the government rested to challenge the test results, thereby giving those results an air of validity, (2) that he was denied an immediate right to confront the witness by being forced to wait until the government rested, and (3) that by challenging the evidence he risked bolstering it. These claims evaporate on

close inspection and are not of constitutional magnitude. Every defendant who presents a defense encounters the first type of "prejudice" in every trial. The second has no basis at all in Sixth Amendment jurisprudence, and the third occurs regardless of whether a witness is cross-examined during the government's case or the defendant's.

cannot be said that any burden of proof has been shifted to the defense simply because cross-examination of the chemist will occur, if at all, during the defense case.

## V

 Brown's final contention is that the trial court erred when it failed to instruct the jury that the court, not the jury, would decide Brown's guilt on the charge of possession of drug paraphernalia.[14] He contends that this failure prejudicially confused the jury in its consideration of the drug possession charge. The court declined so to instruct the jury because the paraphernalia charge was mentioned only once, briefly, at the outset of the trial and because the court was concerned that even mentioning it would require complicated instructions about the limited evidentiary use of the crack pipe.

 We hold that this claim of error is barred because defense counsel at trial specifically asked the court not to instruct the jury on this matter: "I would prefer to leave it at that [*i.e.*, that the jury not be instructed]; if they have a query, they will ask." We have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal. *E.g.*, *Mitchell v. United States*, 569 A.2d 177, 180 (D.C.), *cert. denied*, 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990); *Byrd v. United States*, 502 A.2d 451, 452–453 (D.C.1985); *accord, Hackes v. Hackes*, 446 A.2d 396, 398 (D.C.1982) (applying same rule to civil litigants). Because defense counsel specifically asked the court not to give an instruction on this point, we will not consider appellant's present claim that the court erred in failing to give it.

## VI

For the foregoing reasons, the judgment of conviction is

*Affirmed.*

14. There was, of course, no right to a jury trial on this charge because the maximum penalty for a violation of D.C.Code § 33–603(a) was

thirty days in jail or a $100 fine, or both. *See Simmons v. United States*, 554 A.2d 1167, 1170 n. 6 (D.C.1989).