Joseph D. PENNY, Appellant,

v.

UNITED STATES, Appellee.

No. 94–CM–1114.

District of Columbia Court of Appeals.

Submitted Feb. 14, 1996.

Decided May 1, 1997.

David Carey Woll, appointed by court, Gaithersburg, MD, was on brief, for appellant.

Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Anthony Asuncion, Assistant United States Attorneys, were on brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and BELSON, Senior Judge.

TERRY, Associate Judge:

Appellant was convicted of possession of cocaine and of three other offenses involving a gun. On appeal he contends that the trial court erred in denying his motion to suppress the cocaine and the gun and in admitting evidence of his conduct shortly before his arrest. We affirm.

I

At the pre-trial suppression hearing, Metropolitan Police Officer Eric Miller testified that he and his partner, Officer James Towne, had set up a "covert surveillance" in the 900 block of Shepherd Street, N.W., at about 10:00 p.m. on November 20, 1993. From their hidden observation post, the officers saw appellant Penny standing in front of an apartment building, engaging in what appeared to be drug trafficking. Officer Miller testified:

[F]or about one hour we were watching him, we saw, I believe, three individuals approach him. . . . [T]hey disappeared into the apartment building. We didn't see what happened, but in a minute or two they would come back out, and the individual who had approached Mr. Penny would then depart.

From their experience, the officers found this behavior "consistent with . . . street-level narcotics dealing" and believed that what they had seen on each of these occasions was "an exchange of money for drugs."

The officers had to go back to the police station to take care of some other business, but when they returned to Shepherd Street shortly after midnight, they saw Penny once again standing in front of the same building. After a few minutes he left, and the officers took advantage of his absence by entering the apartment building themselves. They went up to the front door, found it unlocked, and walked into the vestibule. Immediately inside the door was a stairway leading up to the second and third floors and down to the basement. They went downstairs and found themselves in a small storage area. A door at the opposite side led to the furnace room, and beyond that was another door leading out to the alley.[1] After "look[ing] around a little bit" for about ten minutes, the officers unlocked the back door, then retraced their steps and left the building through the front door. They walked halfway around the block, returned to the rear of the building, and entered through the back door that they had left unlocked. Once inside, they turned out all the lights in the basement and waited there for Penny to return.

At about 1:30 a.m. the officers saw Penny enter the building through the front door and come down the basement stairs. They watched as he placed a brown paper bag behind some paint cans at the bottom of the stairwell. He then went into the storage area, turned on the light, and placed a gun on the floor behind some venetian blinds that were leaning against the wall. As Penny

---

1. Miller testified that he and his partner did not have to enter or pass through anyone's apart-
   ment to reach the basement.

turned to go back upstairs, the officers came forward from the shadows and placed him under arrest. After putting handcuffs on him, Officer Miller retrieved the brown paper bag, and inside it he found four plastic ziplock bags, each of which contained a quantity of crack cocaine. The officers also seized the gun from behind the venetian blinds.

Penny testified that he lived in an apartment on the third floor of the building. On the night he was arrested, he said, the front door of the building was locked, and he had to use his key to get in. He also stated that the back door of the basement had a lock. Normally "it should have been locked," but sometimes tenants would take their trash out to the alley through that door and leave it unlocked. Consequently, he said, he was not sure whether it was locked or unlocked that night.

In denying the motion to suppress, the court found the officer's testimony more credible than that of appellant Penny, specifically on the issue of whether the front door of the building was locked or unlocked.[2] The court agreed with the government that Penny, even though he lived in an apartment upstairs, had no reasonable expectation of privacy in the common areas of the building, such as the front stairwell and the basement:

> [J]ust because you live in an apartment building, you have no expectation of privacy in all the public rooms in that place. You may have in your own apartment, but they [the officers] weren't in his apartment; his apartment was on the third floor, according to the testimony, so they had a perfect right to be in the public room. As he [Penny] said, the public room was used by tenants who went in and out that back door to take their garbage out,

their trash out, many times left the door unlocked. So I don't think there was any expectation of privacy....

The court also ruled, in the alternative, that Penny had abandoned the gun and the paper bag when he hid them in the basement.

The testimony at trial was substantially the same as that at the suppression hearing, except that both officers testified, rather than just one. They described the contacts that Penny had with three other persons over the course of an hour as they watched from their observation post. Officer Miller said that what he saw was "consistent with what we've observed for street-level narcotics dealing," and Officer Towne said that he "believed that probably there were narcotic transactions going on inside the building." The court immediately gave a cautionary instruction, telling the jury that "the defendant is not on trial for narcotic transactions," and that the evidence of what the officers saw was introduced "only for your consideration of whether it shows or tends to show an explanation of the background, of the surrounding circumstances of the offense for which he is on trial, which is simple possession of the narcotics." The court gave similar instructions once more during the testimony and again during its final charge to the jury.

## II

■ ■ Appellant's main contention on appeal is that the police officers' warrantless seizure of the gun and the cocaine violated the Fourth Amendment.[3] Before we may consider whether there was a violation, however, we must first decide whether appellant had a legitimate expectation of privacy in the

---

**2.** The court noted that Officer Miller had testified that he "saw people going in and out of the building after talking to [Penny] and there was no testimony that any one of them used a key or did not use a key, so on balance I take the word of the officer over that of the defendant."

**3.** Appellant also contends that the trial court erred in allowing the jury to hear evidence about his apparent drug transactions with other persons on the night when he was arrested, as well as references to a "stash" of drugs which would have suggested to the jury that he was a drug dealer. This court, however, has repeatedly and

consistently upheld the admission of such evidence. *See, e.g., Bell v. United States,* 677 A.2d 1044, 1047–1048 (D.C.1996); *Bernard v. United States,* 575 A.2d 1191, 1196 n. 7 (D.C.1990); *Toliver v. United States,* 468 A.2d 958, 960–961 (D.C.1983); *Green v. United States,* 440 A.2d 1005, 1007 (D.C.1982). We note, in addition, that the trial court on three occasions gave cautionary instructions to the jury regarding this evidence which were sufficient to dispel any possible prejudice. We find no ground for reversal here.

area where the gun and the cocaine were seized.

Surprisingly, the precise issue presented here has not previously been decided by this court. In *Brown v. United States,* 627 A.2d 499 (D.C.1993), another case involving a police seizure of drugs in the stairwell of an apartment building in the middle of the night (4:00 a.m.), we held that the defendant Brown had no legitimate expectation of privacy in that stairwell. *Id.* at 503–505. But Brown was a stranger to the apartment building. He did not live there, nor was he present at the invitation of any of its tenants. Moreover, he admitted that he had never even been in the building before the night of his arrest, "and thus he had no basis in prior experience from which to derive an expectation of privacy there." *Id.* at 503. In the case at bar, by contrast, appellant Penny was a tenant in the building, with an apartment on the third floor. The question we must decide, therefore, is whether his tenancy tips the scales in his favor so as to give him standing to challenge the seizure of the contraband in the basement.

■ Because "the Fourth Amendment protects people, not places," *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), we must focus our attention on whether appellant himself had a reasonable expectation of privacy in the basement storeroom and the stairwell. The overwhelming weight of authority is against him. In defining the area in which an apartment dweller may have a reasonable expectation of privacy, case law generally draws the line at the threshold of the apartment rather than the front door of the apartment building. *See Brown, supra,* 627 A.2d at 504 n. 6 (citing cases). We agree with the Second Circuit's observation in *United States v. Holland,* 755 F.2d 253 (2d Cir.), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985), that "the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors." *Id.* at 255 (citations omitted).

■ One of the principal factors for us to consider in determining whether Penny had a reasonable expectation of privacy in the basement is whether he had "authority to exclude others from the area entered and searched...." *United States v. Booth,* 455 A.2d 1351, 1353 (D.C.1983); *see Brown, supra,* 627 A.2d at 503. Penny argues strenuously that he had such authority, relying on our decision in *Woll v. United States,* 570 A.2d 819 (D.C.1990). But *Woll* does not support his argument. The defendants in *Woll* entered an office building in downtown Washington and congregated in a corridor outside an abortion clinic, which occupied a suite on the third floor. When they refused to leave at the direction of the police, whose aid had been sought by the owner of the clinic, they were arrested and were later convicted of unlawful entry. The issue in *Woll* was whether the owner of the clinic, who was the tenant of the suite of offices, was a "person lawfully in charge" of the corridor outside her suite within the meaning of the unlawful entry statute.[4] We held that she was, rejecting the argument that only the owner of the building could be deemed the "person lawfully in charge."

*Woll* is inapposite here for at least two reasons. First, in *Woll* we were construing the unlawful entry statute, which prior case law had directed us to interpret broadly in a reasonable, common-sense manner, without undue regard for "the niceties of real property law...." *Woll,* 570 A.2d at 823. Our holding that the clinic owner, as a "person lawfully in charge," could validly seek the removal of the demonstrators from the corridor immediately outside her door does not necessarily mean that any tenant of an apartment in a multi-unit building has authority to exclude other persons from a common area in another part of the building—in this case, an area three stories below the tenant's leased premises. Second, and more importantly, there was specific evidence in *Woll* showing that the tenant had some authority over the corridor outside her suite: the lease itself was introduced into evidence, and its

---

4. D.C.Code § 22–3102 (1996) provides that any person who refuses to leave any public or private building "on the demand of the lawful occupant, or of the person lawfully in charge thereof," is guilty of unlawful entry.

language gave the tenant certain rights with respect to the corridor. In the instant case, however, there was no evidence at all from which the court could find that appellant had any "authority to exclude others from the area entered and searched...." *Booth*, 455 A.2d at 1353. Thus, even assuming that *Woll* lends some measure of substance to appellant's argument, it ultimately fails for lack of evidentiary support.

We therefore adopt the reasoning of the Second Circuit in *Holland* and the cases on which *Holland* relies, 755 F.2d at 255–256, and hold that the tenant of an apartment in a multi-tenant building has no reasonable expectation of privacy in the common areas of that building, such as hallways, stairwells, and basements.[5] It follows that appellant Penny had no standing to challenge either the presence of the police officers in the basement or their seizure of the gun and the cocaine.[6]

The judgment of conviction is

*Affirmed.*

Before FERREN, FARRELL, and KING, Associate Judges.

---

**5.** What we say here about apartment buildings does not necessarily apply to rooming houses. This court has twice held that a tenant in a rooming house, not obviously open to the public, has a reasonable expectation of privacy in its common areas. *Bryant v. United States*, 599 A.2d 1107, 1109–1110 (D.C.1991); *United States v. Booth, supra*, 455 A.2d at 1353–1354. *But see United States v. Anderson*, 175 U.S.App. D.C. 75, 79, 533 F.2d 1210, 1214 (1976) (upholding a warrantless police entry into the hallway of a rooming house when the evidence showed that "the common corridors of the building ... were

available to residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises"). We have no occasion here to try to reconcile *Anderson* with *Bryant* and *Booth*, except to note that in *Booth*, 455 A.2d at 1354, the court distinguished *Anderson* on its facts.

**6.** In light of our holding that appellant lacked standing, we need not address the government's alternative argument that appellant abandoned the gun and the cocaine.