Rashawn M. KING, Appellant,

v.

UNITED STATES, Appellee.

No. 10–CF–1263.

District of Columbia Court of Appeals.

Argued May 30, 2013.

Decided Aug. 22, 2013.

Debra L. Soltis, Washington, DC, for appellant.

James M. Pérez, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Jennifer Kerkohoff, and Todd Gee, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and RUIZ, Senior Judge.

RUIZ, Senior Judge:

Rashawn King appeals his convictions for first-degree murder and related weapons charges. On appeal, he challenges two evidentiary rulings: The admission of evidence of flight and the admission of evidence he claims falsely implicated him in threatening a witness. We conclude there was no error requiring reversal and affirm appellant's convictions.

## I.

On October 14, 2008, Toni Smart identified appellant as the man she saw shoot and kill her friend, James Hill, earlier that day.[1] After Smart's identification, police searched for appellant. They obtained a

---

1. At trial, Smart and her boyfriend, Rickie Clemonts, both testified that they had been smoking marijuana and drinking with Hill in an alley when appellant approached and demanded Hill pay him back a $50 debt. According to Smart, when Hill refused, appellant produced a pistol and shot Hill about five times. Clemonts testified that he did not see the shooting, but confirmed appellant's presence in the alley at the time of Hill's death.

Three other government witnesses also testified that appellant was in the alley at the time of the shooting, but they did not see the shooting take place. Appellant called Antwain Sturgis, who claimed to have also witnessed the shooting. Sturgis, who knew appellant, testified that appellant was not the shooter and that Hill was killed by an unidentified man.

warrant for his mother's house on Howison Street, S.W., where they believed he lived, but did not find him there. The police set up surveillance in the neighborhood and monitored the area for ten days. During the period the police were monitoring the area, they did not see appellant return. Ten days after Hill's death, elsewhere in the District of Columbia, police pursued a vehicle through rush hour traffic after receiving a report of a carjacking. The driver crashed the car and fled on foot, but was eventually caught and arrested. After his arrest, the driver told police his name was "James King." The police later discovered that the name was fake, and that the driver was actually appellant, Rashawn King. Appellant was tried and convicted on carjacking charges before his trial on the murder charges began.[2]

## II. Flight Evidence

### A. The Evidence of Flight and the Trial Court's Rulings

Appellant contends that the trial court erred when it allowed the government to present "flight" evidence to the jury as evidence of his consciousness of guilt. Before analyzing the precedents in this jurisdiction governing the admissibility of flight evidence, we recount the evidence and the trial court's rulings in this case.

The government asked permission to admit flight evidence during a pre-trial conference. The government explained it wanted to introduce evidence that, after the shooting, appellant "had fled from the neighborhood." The government also asked to introduce evidence that appellant had been apprehended after a car chase and "gave a fake name" when arrested. The government "believe[d] that providing a false name, particularly where he had

reason to believe he was wanted for this murder, is admissible evidence to show consciousness of guilt." In order to avoid presenting prejudicial evidence of the carjacking, the government "intended to present . . . evidence that officers attempted to stop [appellant] in a vehicle, with no mention of the armed carjacking or that it was a vehicle taken in an armed carjacking, that [appellant] fled in a vehicle, and that after the chase was stopped and gave the name on October 24th, and to leave it at that."

The court commented that "it appears to me that [appellant's] absence from his regular neighborhood immediately after this event for 10 days, giving—you know, basically being—I don't know if it amounts to a chase or just being followed by the police over quite a few blocks, giving a fake name—it seems all of that is admissible on the issue of consciousness of guilt." Defense counsel responded that he "ha[d] no objection to the second part about being stopped in the car," but questioned the government's ability to "establish that he was spending the night in his mother's up until the [day of the shooting], and a lot of the times he was not. Just to add consciousness of guilt we think is a leap without any foundation." The government proffered that a police officer had "talked to [appellant] a week before the incident" outside his mother's house, and explained that appellant's mother had "testified at the last trial, the carjacking trial, that while [appellant] sometimes stayed elsewhere, he regularly stayed at her house and was living with her at the time . . . of the armed carjacking." Defense counsel then proffered that appellant was "actually on the run for a juvenile matter" between

---

**2.** This court affirmed appellant's carjacking conviction in *King v. United States,* 74 A.3d 678 (D.C.2013).

the time of the shooting and his apprehension.

The court ruled that the government had "a basis" for its flight argument, but cautioned the prosecutor to "avoid anything about the vehicle being carjacked or ... stolen." As to defense counsel's explanation that appellant was avoiding his house because of "a juvenile matter," the court explained that the defense would be "permitted to offer that alternative explanation as to why [appellant] was not there," but that the explanation did not change the fact that "the government has a basis with the information they have, wishing to argue consciousness of guilt to the jury." [3]

At trial, the government called Officer Willie Galtney. Galtney testified that, around 5:30 p.m. on October 24, 2008, he began pursuing a vehicle in response to "a transmission over the Seventh District radio zone from the dispatcher." Galtney described a chase conducted at a "high rate of speed" over the Anacostia Bridge, weaving out of "bumper-to-bumper traffic," that culminated when the vehicle went "into a parking garage" and "crash[ed] into ... a U.S. postal van that was parked in the garage." The driver then "bailed out of the vehicle," went over a fence, and ran off. Galtney pursued, but the driver was eventually apprehended by another officer "a short time later." [4] At trial, Galtney identified pictures of the car crash, the car inside the parking garage, and appellant.

Defense counsel asked Galtney if he had been "pursuing [appellant] related to this murder[.]" The government objected, and the court summoned the attorneys to the bench. There, the court asked defense counsel if he really "intended to get into" this area of questioning. Counsel responded that he thought the question to the officer was "fair," and "would still keep the ground rules of not getting into the carjacking." The court replied "I don't think so," and cautioned the defense attorney that he would "open the door" if he continued. Counsel withdrew the question, and Galtney was excused.

The government also introduced evidence showing that a search warrant had been executed shortly after the shooting at the home of appellant's mother. During the search, the police located two identification cards belonging to appellant. No other homes were searched in connection with the investigation. Detective Antonio Duncan described his work with the "fugitive task force," as they set about attempting to locate appellant. The detective recounted "setting up[ ] multiple units ... throughout the block" where appellant's mother's home was located, but testified that between October 15 and 24, no one on the task force observed appellant in the neighborhood near his mother's house. Detective Duncan explained that the task force had conducted "computer checks" for appellant and his family, "conducted interviews," and placed appellant's father under surveillance. On cross-examination, De-

**3.** Although defense counsel mentioned the "juvenile matter" in opening statement, counsel presented no evidence of this "juvenile matter" during the trial, and did not refer to it again. Later, defense counsel informed the judge the defense had "expected to call [appellant's] aunt" to testify about this issue, but "found out that she was in the courtroom, so we didn't have her available as a witness." The government opined at the time that any

testimony about "why [appellant] was fleeing ... would open the door to the admission of his impeachable convictions"; which would have included his recent conviction for carjacking.

**4.** A police sergeant later testified that appellant had claimed his name was "James King" after his arrest.

tective Duncan admitted that the task force had lacked a current address for appellant's girlfriend, but had looked for her unsuccessfully at an address she vacated before the investigation began.

During closing arguments,[5] the prosecutor focused primarily on the eyewitness evidence that tied appellant to the shooting. However, the prosecutor also remarked on the evidence of appellant's flight from the neighborhood and from the police:

> You also have as corroboration the defendant's flight. You know from the evidence presented to you that the defendant didn't stay at his house. Officers were there within hours executing a search warrant. They had an arrest warrant. The defendant was not at his home. The task force, the fugitive task force, was put on it. They staked out his house. They canvassed the area. They staked his father and followed his father around. No defendant. All the officers in the First District were told to look for Rashawn King. No one found him.
>
> October 24th, 10 days after the shooting, he's not in Southwest. He's down in another part of the city, the Seventh District, where when the officers try to stop him, he engages in a high-speed chase through the city at rush hour, crashing the car. And when he's finally stopped on foot, he says, "My name is James King," not Rashawn King. And the judge has instructed you [that] you may consider his flight, his flight from the area and his flight on October 24th as evidence of consciousness of guilt. All that corroboration is evidence that what Toni [Smart] has said is truthful. That is evidence you may consider.

## B. Flight Evidence Analysis

*Evidence related to appellant's apprehension following his pursuit by the police*

■ Appellant claims the trial court erred when it permitted the government to introduce evidence that he fled from the police in a car at high speeds and, after he was apprehended and arrested, gave a false name. However, as the government correctly notes, appellant waived this issue during the pre-trial hearing when defense counsel informed the court that he had "ha[d] no objection to the second part about being stopped in the car." "We have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal." *Brown v. United States,* 627 A.2d 499, 508 (D.C. 1993). Here, appellant affirmatively acquiesced to the introduction of the evidence about which he now complains. As a result, we "will not consider [appellant's] present claim that the court erred" by failing to *sua sponte* exclude the evidence of the police chase and appellant's use of an alias. *Id.*[6]

---

5. Prior to closing arguments, the trial court gave the following instruction without objection:

> You've heard evidence that the … defendant fled or hid after the alleged crime was committed or after being accused of a crime. It is up to you to decide whether he fled or hid. If you find he did so, so may consider his fleeing or hiding as tending to show feelings of guilt, which you may in turn consider as tending to show actual guilt. On the other hand, you may also consider that the defendant may have had reasons to flee or hide that are fully consistent with innocence in this case. If you find that the defendant fled or hid, you should consider such evidence along with all the other evidence in the case and give it as much weight as you think it deserves.

6. Defense counsel's attempt at trial to cross-examine the officer to dispel the inference that appellant had been chased and arrested because of the murder did not overcome his earlier acquiescence to admission of the evi-

*Evidence related to appellant's absence from his mother's home*

Defense counsel did, however, object to the admission of evidence showing that appellant was not at his mother's home for ten days. Accordingly, we evaluate that claim for an abuse of discretion and *Kotteakos* harmless error. *Williams v. United States*, 52 A.3d 25, 36–37 (D.C.2012) (applying abuse of discretion review to "consciousness of guilt evidence"); *White v. United States*, 613 A.2d 869, 874 (D.C. 1992) (en banc) (explaining test for "nonconstitutional harmless error" under *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

In the District of Columbia, a defendant's flight or concealment is considered a variety of an " 'admission[ ] by conduct.' " *Burgess v. United States*, 786 A.2d 561, 569 (D.C.2001) (quoting *Proctor v. United States*, 381 A.2d 249, 251 (D.C. 1977)). However, like almost all other courts, we have long made it clear that because "flight" evidence may have a "strong impact" on the jury, the trial court must "carefully consider the facts in each case and ... determine whether the probative value of such testimony is outweighed by the potential for prejudicial impact." *Williamson v. United States*, 445 A.2d 975, 981 (D.C.1982); [7] *see also Alberty v. United States*, 162 U.S. 499, 511, 16 S.Ct. 864, 40 L.Ed. 1051 (1896) (discussing the weaknesses inherent in flight evidence, and remarking that "it is a matter of common knowledge that men who are

entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses"); *United States v. Vereen*, 429 F.2d 713, 715 (D.C.Cir.1970) ("Flight instructions have received substantial criticism in recent years, chiefly because the risk is great that an innocent man would respond similarly to a guilty one when a brush with the law is threatened.").

Accordingly, the trial court must determine, "*before* evidence is admissible to establish consciousness of guilt," whether "the chain of inferences connecting the defendant's post-crime conduct to the crime itself would allow the jury to find that the conduct was inconsistent with that of an innocent person." *Williams*, 52 A.3d at 39 (emphasis added). This court has adopted the "chain of inferences" analysis laid out by the Fifth Circuit in its landmark case on the admissibility of flight evidence, *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977). *See Williams*, 52 A.3d at 39–40 n. 52 and n. 54 (referring to *Myers* as the "leading case" on this issue, reciting cases from this jurisdiction in which it has been applied, and applying its "chain of inferences" analysis). *Myers* established that before evidence of flight may be admitted, the government must establish the following: (1) that the defendant's behavior was flight, (2) that the flight demonstrated consciousness of guilt, (3) that the consciousness of guilt was consciousness of guilt of the crime charged

---

dence of the car chase and arrest. Appellant does not argue on appeal that even if the evidence of flight was properly admitted, counsel should have been permitted to cross-examine on this point without opening the door to admission of the carjacking.

7. The overall standard for this analysis is no different from the one generally required since our adoption of Federal Rule of Evi-

dence 403, whether probative value is "substantially outweighed" by prejudicial impact. *(William) Johnson v. United States*, 683 A.2d 1087, 1099–1100 (D.C.1996). However, in light of the recognized potential for prejudice of flight evidence, we have required courts to be confident that the evidence is actually probative guilt of the charged crime, as explained further *infra*.

and (4) that consciousness of guilt of the crime charged demonstrates actual guilt. *Myers,* 550 F.2d at 1049. Then, once the trial court is satisfied these factors are met, the trial court must, as in every decision to admit evidence, weigh its probative value against the potential for undue prejudice. *See (William) Johnson,* 683 A.2d at 1099–1100.

■ Here, the trial court did not conduct the complete *Myers* inquiry, as required by *Williams,* before determining that the evidence of appellant's flight was admissible. The trial court should have engaged in a further inquiry in order to ensure that the government's evidence of flight demonstrated " 'actual guilt of the crime charged.' " *Smith v. United States,* 777 A.2d 801, 807 (D.C.2001) (emphasis added) (quoting *Scott v. United States,* 412 A.2d 364, 371 (D.C.1980)). Here, the trial court did not evaluate defense counsel's proffer at the pre-trial hearing challenging the government's assertion that appellant lived with his mother[8] or consider the argument that appellant was on the run for a juvenile matter. Instead, the trial court responded that appellant could "offer that alternative explanation as to why he was not there" but that "the government has a basis with the information they have ... to argue consciousness of guilt to the

jury." We think the trial court was required to do more before admitting the evidence of flight.[9] When a defendant may have an unrelated strong reason to avoid the police, like guilt for another crime or fear of incarceration on an outstanding warrant, the trial court must consider that reason before determining whether to admit the government's evidence of flight as relevant to consciousness of guilt of the charged crime. As we noted in *Williams,* "[i]f the action that allegedly creates the inference [here, absence from mother's home] suggests, as it does here, a reasonable alternative interpretation [being with girlfriend, or on the run for a juvenile matter], the probative value largely, if not completely, disappears." 52 A.3d at 41. No such evaluation of alternative explanations was done in this case, despite defense counsel's timely proffer that appellant's absence from his mother's house was attributable to an unrelated cause. Therefore, we cannot say that the trial court properly exercised its discretion when deciding to admit evidence of appellant's flight from his mother's home. *Id.* at 40 ("Whatever analytic premise we use, probative value or unfair prejudice, the inquiry shifts to context—to appellant's proffered [alternative] explanations . . . .").

---

8. Even if the trial court should have excluded the evidence because the government's pre-trial proffer on this point was weak, the defense's opening statement (explaining that he had fled his mother's home because of the juvenile matter), cross-examination of Smart (where counsel elicited Smart's testimony that appellant lived with his mother) and direct examination of Sturgis (same), subsequently cured the deficiency by filling in the gaps enough to permit the jury reasonably to infer that appellant regularly stayed at his mother's house.

9. While some of our cases have acknowledged that the existence of alternative explanations for a defendant's flight—other than conscious-

ness of guilt of the charged crime—will not necessarily preclude the presentation of flight evidence to a jury, *see Smith,* 777 A.2d at 808, we have never substituted the jury's evaluation of the defendant's competing explanation for the trial court's obligation to determine in the first instance whether "the circumstances *reasonably support an inference* that [the defendant] fled because of consciousness of guilt of the charges relating to [the charged crime], and [whether] the probative value of the flight evidence is not outweighed by the potential prejudicial impact on the jury." *Id.* (noting that "[n]othing in the record suggests that Smith's flight could be linked to any other criminal conduct").

However, even if the trial court's analysis was inadequate, before we can conclude there has been an abuse of discretion, *id.* at 41, we also must determine that appellant was substantially prejudiced, by evaluating the impact of the error on the outcome of the trial. *See (James) Johnson v. United States,* 398 A.2d 354, 366 (D.C.1979). In this case we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239; *see Smith,* 777 A.2d at 809 n. 13.

We consider the challenged evidence of flight in the context of the trial as a whole. *See Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239. The trial's most important testimony came from Smart, who watched as Hill was shot multiple times in the chest and back. Smart knew appellant and immediately identified him as the shooter. Moreover, Smart's descriptions of the shooting and the events leading up to it were corroborated by other witnesses. For example, the medical examiner testified that Hill was shot seven times in both "his front and his back." Also, several witnesses who knew appellant—Clemonts and some of appellant's neighbors—confirmed that appellant was in the alley at the time of the shooting. Although Smart was the only person who testified to having seen the shooting, her testimony that appellant had confronted Hill in the alley over an unpaid debt, left the alley, and then returned to the alley wearing a jacket, was corroborated by other witnesses. Smart was not a model citizen—she admitted to drinking, smoking marijuana, taking "E pills" and selling crack cocaine on the day of the shooting, in addition to occasionally carrying a gun in what she described as the "dangerous" neighborhood where the shooting occurred—but her account of the events was not seriously impeached. The only contradictory evidence came from Sturgis, who claimed appellant was not in the alley when the shooting occurred, although he had been there earlier.

Reviewing the evidence at trial as a whole, we are clear that the case for appellant's guilt was strong, almost overwhelmingly so. We also think that the challenged evidence of flight from appellant's home was of secondary importance in the trial. First, during opening statement, defense counsel admitted that appellant was "on the run" because of a juvenile matter during the time the police were searching for him after the shooting of Hill and defense counsel implied in closing argument that appellant was simply staying with his girlfriend during this time.[10] Thus, counsel essentially admitted that appellant was not at his mother's house—the very point of the government's evidence—but gave a different reason for his absence. In addition, there was evidence of a different flight, involving a car chase, that appellant did not object to. Thus it is unlikely that appellant was unfairly prejudiced as a result of the government's introduction of evidence that he could not be found at his mother's home immediately after Hill was shot. On this record, we are confident that appellant was convicted on the strength of Smart's eyewitness testimony, corroborated in meaningful respects by the testimony of the other witnesses presented at the trial. We doubt that the evidence of appellant's flight from his mother's home was given decisive weight by the properly instructed jury.

**10.** There does not appear to have been any evidence presented at trial supporting either assertion.

### III. Evidence of Witness Intimidation

■ Appellant also argues that the government's efforts to impeach Sturgis's testimony during the defense case resulted in the introduction of impermissible evidence of witness intimidation. *See, e.g., Foreman v. United States*, 792 A.2d 1043, 1050 (D.C.2002) ("[I]f the trial court admits evidence of threats solely to attack the general credibility of the witness, such admission is an abuse of discretion.") Specifically, he complains that the prosecutor impermissibly implied that Sturgis had threatened Smart when questioning Sturgis on cross-examination and attempted to present hearsay rebuttal evidence on the same subject. We see no error or basis for reversal. " 'A witness' bias is always a proper subject of cross examination,' " *Mason v. United States*, 53 A.3d 1084, 1094 (D.C.2012) (quoting *McCoy v. United States*, 760 A.2d 164, 174 (D.C. 2000)), and so the government was entitled to demonstrate Sturgis's bias in favor of appellant by attempting to show that he encouraged Clemonts and Smart not to testify at appellant's trial. *See id.* ("Accordingly, evidence that tends to show bias, even if extrinsic to issues raised on direct examination, should be admitted." (internal quotation marks and citation omitted)).

■ Further, the prosecutor's questioning did not cross the line this court drew in *Foreman*. The prosecutor's question to Sturgis did not implicate appellant; it did not even imply that Sturgis "threatened" Clemonts or Smart, only that he called and told Clemonts "that [he was] going to say [he] didn't see anything and [he wasn't]

coming down here to testify and [Clemonts] shouldn't either." Although the implication is clear that Sturgis was suggesting that Clemonts and Smart should not testify against appellant, there is no suggestion that Sturgis threatened to do them harm if they did not do as he suggested. Nor did Detective Jackson's testimony that Smart was "upset" because of Sturgis's call establish that she was afraid of or threatened by Sturgis.[11] Appellant speculates that the jury would have connected this evidence, which came at the end of the trial, to Smart's earlier testimony that she felt threatened by the neighborhood culture against snitches.[12] We see no reason for the jury to have made this connection, or to have attributed any of Sturgis's actions to appellant, and note that the prosecutor did not ask the jury to do so in closing arguments. We, therefore, see no merit in appellant's contention that he was prejudiced by the admission of impermissible evidence of witness intimidation.

The judgment of conviction is

*Affirmed.*

---

11. Since the trial court properly prevented the government from eliciting hearsay statements from Detective Jackson, we reject appellant's claim of error on that basis.

12. When asked "[w]ho says you're not supposed to snitch?," Smart replied: "That's what the neighborhood does. You get caught snitching, you will disappear." Smart also said that she gets "threatened all the time." The prosecutor then tried to get into specifics, but the trial court prevented further inquiry after a lengthy colloquy.