UNITED STATES of America,

v.

Willie ANDERSON, Appellant.

No. 75–1318.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1975.

Decided March 22, 1976.

Richard A. Solomon, Washington, D. C. (appointed by this court), for appellant.

Roberta T. Eaton, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, James F. McMullin and Charles E. Wagner, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before McGOWAN and LEVENTHAL, Circuit Judges, and McMILLAN,* United States District Judge for the Western District of North Carolina.

Opinion for the court by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

Appellant was convicted by a jury in the District Court of one count of possession of an unregistered firearm (a sawed-off shot-gun) in violation of 26 U.S.C. § 5861(d) (1970). He raises a number of issues on this appeal, including the denial of his pretrial motion to suppress certain evidence, especially the barrel stock of a sawed-off shotgun which had been seized in a warrantless search of his room after he had been arrested and removed therefrom. We conclude that the barrel stock was the fruit of an unconstitutional search, and that its admission into evidence was prejudicial error requiring reversal.

## I

Officers Burton and Wright of the Metropolitan Police Department testified at the suppression hearing that they were on duty at approximately 2:05 P.M. on November 21, 1974, when they were hailed by one Strother, who claimed that he had just been assaulted by a man with a sawed-off shotgun in room eight at 1434 Corcoran Street.[1] The two police officers accompanied Strother to that address, and in the course of their brief ride Strother recounted the circumstances surrounding the assault. Strother claimed to have gone to appellant's room to collect a five dollar debt that appellant allegedly promised to repay on that afternoon. Upon arriving at appellant's room, Strother found the door unlocked and appellant asleep. After trying unsuccessfully to wake appellant, Strother fell asleep on the bed beside him.

When appellant awoke he told Strother that "he [appellant] was the meanest man on 14th Street" and began to display a sawed-off shotgun. After Strother informed appellant that he should not have a shotgun in his possession unless it was properly registered, appellant became angry and Strother left the room. At that point appellant followed Strother to the street and threatened him with the sawed-off shotgun.

On the basis of this information, the two police officers entered the rooming

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. The police officers' testimony at trial was identical in all material respects to their testimony at the suppression hearing. Strother, the complainant, did not testify at the suppression hearing, but his testimony at trial corroborated the testimony of the officers concerning the information he gave them.

house at 1434 Corcoran Street and proceeded directly to room number eight. Officer Wright testified that as he reached appellant's room the door was wide open and he could see appellant sweeping the floor. According to Wright, appellant then noticed the police officers and lunged for a sawed-off shotgun which Wright saw on the bed in appellant's room. Officer Wright then told appellant to freeze. Officer Burton, who was standing slightly behind Officer Wright as they reached appellant's room, also testified that the door to the room was wide open. After he heard his partner tell appellant to freeze, Officer Burton moved up to the doorway in time to see appellant reaching for the shotgun.[2] The two police officers then entered the room and Officer Burton proceeded to handcuff appellant. At about that time they were joined by a third police officer, Officer Wagner, who advised appellant of his constitutional rights.[3] Meanwhile, Officer Wright seized the shotgun on the bed.[4]

Appellant's testimony at the suppression hearing gave a markedly different version of the events leading up to his arrest. He said that he had never seen Strother before November 21, 1974, and that he awoke that day around 11:45 A.M. and found Strother in his room. According to appellant, Strother announced that he was armed and asked for appellant's money. Appellant claims that he then fooled Strother into thinking that he [appellant] had a .25 caliber automatic and chased Strother from the room. Appellant then went into the hallway of the building, noticed Strother on the second floor, and told him to leave. Strother threatened to return, and at that point appellant chased him from the building and warned him not to come back. Upon returning to his apartment, Anderson discovered that Strother had left behind a bag containing a sawed-off shotgun and five or six shells. Appellant then loaded the gun with the shells so that he would be prepared in the event Strother returned with "his boys." It was shortly thereafter that, according to appellant, six police officers broke through the door to his room and placed him under arrest.

Despite the different versions presented at the suppression hearing and at trial, appellant accepts for the purposes of this appeal the testimony of the police officers

---

2. A third police officer, Officer Wagner, was coming up the stairs leading to the third floor landing when Wright told appellant to freeze. Wagner testified that at that time the door to appellant's room was open.

3. Appellant also challenges on this appeal the refusal of the District Court to suppress certain statements concerning ownership of the sawed-off shotgun which appellant made to the police officers after acknowledging that he understood his rights. The thrust of appellant's argument is that these statements were not made pursuant to a *knowing* waiver of his rights since he had not been informed of the nature of the law violation for which he had been arrested. On the basis of the record before us, we think the District Court properly concluded that appellant had made a voluntary, knowing, and intelligent waiver of his rights.

It is not clear whether appellant spontaneously indicated that he owned the gun or whether he made the incriminating statements in response to a police officer's twice asking him whether he owned the gun. But even assuming that the statements were made in response to questions, we find the waiver to be valid. Immediately prior to questioning, appellant had been advised of his right to remain silent and his right to counsel. It may well be that appellant would not have answered the question had he known the precise nature of the charge which would be made against him, but that fact does not lead inevitably to the conclusion that his waiver was other than "knowing." Cf. *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

Here, the police had seized the gun from the bed and asked whether appellant owned it. Under those circumstances, appellant was free to remain silent and to consult an attorney before responding. His decision to respond, though based on less information than a qualified attorney might have insisted upon before offering a legal opinion, was nevertheless a knowing waiver of his right not to answer at all or to answer only after consultation with an attorney.

4. The shotgun contained one round of ammunition, and there was an additional round on the bed next to the gun. Our analysis of the constitutional issues involved in the seizure by the police of the sawed-off shotgun are equally applicable to these shells which, like the sawed-off shotgun, were introduced as evidence at trial.

concerning the events leading up to his arrest. Moreover, there is no disagreement over the factual setting of the search that led to the discovery of the barrel stock. After appellant was removed from his third floor apartment and placed in a police transport van by Officer Wagner, the remaining police officers conducted a thorough search of the room, eventually discovering the barrel stock within a closet.

## II

### A. The Sawed-Off Shotgun

Appellant appears to concede in his brief that the constitutionality of the seizure of the sawed-off shotgun depends on the constitutionality of the warrantless arrest of appellant; if the arrest was constitutional, the seizure of the shotgun can be justified under the "plain view" exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564, 581 (1971); *see, e. g., United States v. Peterson*, 173 U.S. App.D.C. 49, 53, 522 F.2d 661, 665 (1975); *United States v. James*, 147 U.S.App.D.C. 43, 452 F.2d 1375, 1378 (1971); *United States v. Johnson*, 147 U.S.App.D.C. 31, 452 F.2d 1363, 1372 (1971); *United States v. Harris*, 140 U.S.App.D.C. 270, 435 F.2d 74, 84 n. 22 (1970), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971). It is appellant's contention, however, that the warrantless arrest was unconstitutional for two reasons: first, the police officers lacked probable cause for an arrest; and second, even given probable cause, there were no exigent circumstances justifying a warrantless entry into appellant's rooming house and appellant's room to accomplish the arrest.

▐ As to the absence of probable cause, appellant argues that "it is established that where most or all of the information supporting reasonable cause for an arrest comes from sources outside the arresting officers' personal knowledge the necessity for showing the trustworthiness of the information becomes more acute." Brief at 17. We would agree that when law enforcement officials apply for warrants on the basis of information supplied by an *informant*, the magistrate must be supplied with adequate information indicating that the *informant* is both credible and reliable. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Moreover, "[w]hether or not the requirements of reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained." *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441, 450 (1963).

▐ But these requirements do not apply with equal force when the police are approached on the street by an unknown citizen who claims to have been the victim of a crime just moments before.[5] As this court noted in *Pendergrast v. United States*, 135 U.S.App.D.C. 20, 416 F.2d 776, 785, *cert. denied*, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969), "probable cause is established where (a) the *victim* of an offense (1) communicates to the arresting officer information affording credible ground for believing that the offense was committed and (2) unequivocally identifies the accused as the perpetrator, and (b) materially impeaching circumstances are lacking." (Emphasis added). *See Nelson v. Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972), *cert. denied*, 412 U.S. 951, 93 S.Ct. 3017, 37 L.Ed.2d 1003 (1973) ("An asserted victim of a crime is a reliable informant even though his or her reliability has not theretofore been proven or tested."). Certainly the information supplied by Strother would "war-

---

**5.** The cases relied on by appellant—*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *Whitley v. Warden of Wyoming State Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971)—involved informants' tips rather than reports of criminal offenses by asserted victims.

rant a man of reasonable caution in the belief" that it was appropriate to proceed to appellant's room to investigate the alleged armed assault. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968). In light of the facts that Strother, who claimed to be the victim of an assault, provided the police officers with the details of the circumstances surrounding the alleged assault and identified the exact location, including room number, of the alleged offense, we conclude that Officers Burton and Wright were discharging a legitimate investigative function when they entered appellant's rooming house and proceeded to appellant's room.

■ Appellant next contends, citing this court's en banc decision in *Dorman v. United States*, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), that even if there were probable cause to make an arrest, there were no "exigent circumstances" justifying a warrantless entry into the corridors of appellant's rooming house. We find it unnecessary to determine whether the circumstances of this case meet the "exigent circumstances" requirement established by this court in *Dorman* for a warrantless entry into a private dwelling for the purpose of accomplishing an arrest.[6] When the police officers entered the rooming house they did not enter appellant's private dwelling; instead they merely entered the common corridors of the building, which were available to residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises. Consequently, insofar as appellant maintains that he had a constitutionally protected reasonable expectation of privacy in the corridors of the rooming house, we disagree; appellant's constitutionally protected privacy interest began at the door

to room eight rather than at the door to the entire rooming house.

■ Having concluded that the police had reasonable grounds to proceed to appellant's address to investigate the alleged assault and that appellant's Fourth Amendment rights were not violated when the police entered the corridors of his rooming house, we are left with the issue of the constitutionality of the warrantless entry into appellant's room for the purpose of accomplishing an arrest. As we noted earlier, although two different versions of the events leading up to the entry into appellant's room were presented at the suppression hearing, appellant accepts the prosecution's version for the purposes of this appeal. Given that version, the police officers were justified in their decision to enter the room. Whether or not they had probable cause to arrest appellant based on the information supplied by Strother, that information, together with appellant's response to the presence of the officers, certainly constituted probable cause for an arrest. And given the circumstances leading to their warrantless entry, "the exigencies of the situation made that course imperative." *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153, (1948). We therefore conclude that the warrantless entry of appellant's room under the circumstances described above and the subsequent warrantless arrest were accomplished in conformity with the Fourth Amendment, and that as a result the seizure of the shotgun on the bed was constitutionally permissible.

*B. The Barrel Stock*

We turn now to the constitutional issues involved in the seizure of the other evidentiary item presented at trial, namely, the barrel stock of a sawed-off shotgun.[7] Prel-

6. The Supreme Court has yet to rule on the question "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." *Gerstein v. Pugh*, 420 U.S. 103, 113 n. 13, 95 S.Ct. 854, 863, 43 L.Ed.2d 54, 65 (1975); *see United States v. Watson*, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598, 605, 44 U.S.L.W. 4112, 4114 n. 6 (1976); *id.* 423 U.S. at 433, 96 S.Ct. at 832, 46 L.Ed.2d at 614, 44 U.S.L.W., at 4116 (Ste-

wart, J. concurring in the result); *id.* 423 U.S. at 425, 96 S.Ct. at 828, 46 L.E.2d at 610, at 4118 (Powell, J. concurring). *But see id.* 423 U.S. at 433, 96 S.Ct. at 832, 46 L.Ed.2d at 615, at 4125 (Marshall, J., with whom Brennan, J., joins, dissenting).

7. Officer Burton testified that no tests were run to determine whether the seized barrel stock

iminarily, we note that there is no dispute concerning the circumstances surrounding the seizure of the barrel stock; it was discovered by the police in a closet in appellant's room after appellant was removed from the room and placed in a police transport van. Given the location of appellant at the time of the search, the Government concedes that the seizure cannot be justified as a "search incident to arrest" under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). As Justice Stewart's opinion in that case emphasizes:

> [T]here is ample justification . . . for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.

395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. Given these limitations on the "search incident to arrest" exception, the seizure of the barrel stock was unconstitutional unless justified under some other exception to the warrant requirement.

matched the remaining stock on the sawed-off shotgun.

**8.** At oral argument the Government provided a fuller explanation of this enlarged exception to the warrant requirement. The Government takes the position that under *Warden v. Hayden* police officers are entitled in cases such as this to conduct a search for weapons and evidence related to the offense which forms the basis of the arrest. But they are not entitled to conduct a general exploratory search. Thus, as the Government noted at oral argument, had the police in this case discovered heroin rather than a barrel stock, the heroin would be inadmissible in a subsequent criminal prosecution. The Government never explained, at least to our satisfaction, why it is that evidence seized during the course of an assertedly valid search must nevertheless be suppressed. *Compare*

The Government presses the argument that when "police officers, having just made an arrest and seizure, reasonably believe that additional evidence will be found nearby, an additional search is permissible and the seized items are admissible as evidence." Brief at 14. According to the Government, this exception to the warrant requirement finds support in the Supreme Court's opinion in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and in this court's opinion in *United States v. Miller*, 145 U.S.App.D.C. 312, 449 F.2d 974 (1970). Neither of those cases provides the slightest support for the novel approach suggested by the Government.[8]

*Warden v. Hayden* involved the issue of a warrantless search of a private dwelling for a suspect seen entering the premises moments after an armed robbery. While quickly searching the premises for the suspect and the weapons he had used, the police discovered a number of items: in a flush tank they found a shotgun and a pistol; in a washing machine they found a jacket and trousers of the type the suspect was said to have worn; under a mattress they found a clip of ammunition and a cap; and in a bureau drawer they found ammunition for the shotgun. All these items were subsequently introduced at the suspect's trial.

In sustaining the validity of the search leading to discovery of the incriminating

*Coolidge v. New Hampshire, supra*, 403 U.S. at 465, 91 S.Ct. at 2037, 29 L.Ed.2d at 582.

There are other serious difficulties with the Government's exposition of its theory. At oral argument the Government contended that *Warden v. Hayden* accomplished a broad modification of *Chimel's* limitations on the "search incident to arrest" exception to the warrant requirement. The obvious difficulty with that position is that *Warden v. Hayden* preceded *Chimel* by some years. Thus, if we were to accept the Government's interpretation of *Warden v. Hayden*, we would be faced with a serious question as to why the Supreme Court went to the trouble of placing important limitations on the search incident to arrest exception if it had already held in *Warden v. Hayden* that broad searches could be conducted even after the arrestee was removed from the premises.

evidence, the Supreme Court expressly noted that:

> [O]nly a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.
>
> . . . [T]he seizures occurred prior to or immediately contemporaneous with [the defendant's] arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived. *The permissible scope of the search must, therefor, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape.*

387 U.S. at 299, 87 S.Ct. at 1646, 18 L.Ed.2d at 787 (emphasis added).

*United States v. Miller* involved a similar "hot pursuit" situation. In that case, the police "had entered the suite of offices in hot pursuit of an armed and fleeing felon. Although the man they sought was in view from the moment the door was opened, they had no way of knowing who else might be on the premises. *In those circumstances, the police could justifiably conduct a search of the suite to assure themselves that no hostile and possibly dangerous persons were hiding in the other rooms.*" 449 F.2d at 977 (emphasis added).

It should be obvious that neither *Warden v. Hayden* nor *United States v. Miller* controls this case. Here, the search was conducted *after* appellant was arrested and removed from the premises rather than *prior to* or *immediately contemporaneous* with appellant's arrest. The Government understandably does not argue that the search was ·a legitimate attempt by the police to assure themselves that they were not in danger while apprehending appellant; there was certainly no danger to the police within this ten foot by twelve foot room once the suspect had been seized, handcuffed, and removed. Instead, the Government argues that the search was conducted because the police officers concluded that

the barrel stock and ammunition might be located nearby. Thus, the only asserted justification for this search subsequent to arrest is one of convenience; the Government takes the view that "it would be quite unreasonable to suggest . . . that the police, instead of conducting a limited search for further evidence related to the criminal offense, be required to abandon their effort, seek a search warrant and then return to conduct a more thorough search."

■ The warrant requirement undoubtedly subjects law enforcement officials to what at times is a not insignificant amount of inconvenience, but the Constitution embodies values going beyond those of convenience and efficiency. Indeed, "[t]here is no more basic constitutional rule in the Fourth Amendment area than that which makes a warrantless search *unreasonable* except in a few 'jealously and carefully drawn' exceptional circumstances." *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 829, 46 L.Ed.2d 598, 44 U.S.L.W. 4112, 4118 (1976) (Powell, J., concurring) (emphasis added), *citing Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958). Since the search leading to discovery of the barrel stock fails to qualify under any of the recognized exceptions to the warrant requirement, we conclude that the District Court was in error when it denied the motion to suppress with respect to this particular item.

■ The only remaining question is whether the admission of the barrel stock into evidence was harmless error. Given the fact that appellant's defense at trial was that the sawed-off shotgun had been left in his room by Strother when he chased Strother from the premises, we are unable to conclude beyond a reasonable doubt that the admission of the barrel stock did not contribute to the verdict. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Government apparently recognizes that the admission of the barrel stock considerably eroded the credibility of appellant's defense, for it failed to argue harmless error in its brief to this court, and at oral argument it stressed the significance

of the barrel stock for the prosecution's direct case.

The conviction is therefore reversed, and the case is remanded for a new trial.[9]

*It is so ordered.*

---

**9.** Two other issues raised by appellant concern a supplementary jury instruction given at the request of the prosecutor and the government's cross-examination of appellant about his prior criminal record. Since these questions arose under circumstances not likely to recur at a second trial, we do not pursue them.