HOWARD, Circuit Judge
(dissenting).
I respectfully disagree that Werra had a reasonable expectation of privacy throughout 63 Menlo Street such that he could challenge the officers’ entry. In any event, I conclude that the officers’ entry into the building was lawful. And I am persuaded that Det. Schaaf lawfully detained and patted Werra during the execution of a valid arrest warrant. These views compel me to dissent from the majority’s conclusion that the firearm found in Werra’s front pants pocket should be suppressed.
I.
Werra must establish that “his own Fourth Amendment rights were violated by the challenged search or seizure.” Rakas v. Illinois, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). His threshold burden is to prove that “he had a legitimate expectation of privacy in ‘the place searched or the thing seized.’ ” United States v. Rheault, 561 F.3d 55, 59 (1st Cir.2009) (quoting United States v. Thornley, 707 F.2d 622, 624 (1st Cir.1983)). To do so Werra must show not merely that he had an “actual, subjective, expectation of privacy,” but that his “subjective expectation is one that society is prepared to recognize as objectively reasonable.” Id. (citing Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). Like the district court, I conclude that Werra has failed to satisfy this burden.
*342 Following a two-day evidentiary hearing, the district court found that Werra did not have an objectively reasonable expectation of privacy. The district court’s findings, set forth in a thoughtful rescript, included the following. Werra paid rent to occupy an “independent living unit” on the third floor, replete with “a bedroom, a kitchenette and a bathroom.” United States v. Werra, No. 06-10414, 2008 WL 4280035, at *1, *5 (D.Mass. Sept. 11, 2008). His third-floor unit was his “personal space” and he “had the ability to keep people out of that part of the building,” although tenants would sometimes “party” on the third-floor, prompting Werra to sleep on a couch downstairs “once in a while” with Cicerano’s permission. Id. at *1. Unlike his third-floor unit, Werra “had no expectation of privacy in the foyer because others over whom he had no control could pass through it without his permission.” Id. at *5. And, critically, Werra failed to demonstrate “that 63 Menlo Street was akin to a traditional home” with evidence “concerning the rights of the residents within the building and the relationships among those who lived there.” Id.
None of our cases is directly on point, but Rheault provides an adequate starting point for the analysis. There, we concluded that a tenant renting the second of three units in a three-story building (a so-called triple-decker) did not have an objectively reasonable privacy expectation in the third-floor landing. 561 F.3d at 57, 61. We reasoned that the proximity of the third-floor landing to the defendant’s second-floor unit cut against the reasonableness of his privacy interest, as did his inability to exclude others from that area. Id. at 61 (“a potentially revolving cast of third-floor tenants and their guests had relatively unfettered access to the very area in which Rheault claims an expectation of privacy”); see also Rawlings v. Kentucky, 448 U.S. 98, 105, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (no privacy interest in purse because petitioner did not “have any right to exclude other persons from [it]”).
Other courts of appeals have reached the same conclusion in circumstances remarkably similar to this case. For example, in United States v. Bedell, the defendant was arrested in the hallway of a “multi-tenant rooming facility” in which he “occupied an upstairs room in exchange for rent.” 311 Fed.Appx. 461, 463 (2d Cir.2009) (internal brackets omitted). After the district court denied his motion to suppress, the defendant appealed on the basis of his purported privacy expectation in the rooming house at large. The Second Circuit, however, rejected his argument. It began with the bedrock principle that “the defendant ‘bears the burden of proving ... that he had a legitimate expectation of privacy in [the area intruded upon].’ ” Id. at 463 (quoting Rawlings, 448 U.S. at 104, 100 S.Ct. 2556). Reviewing the “scant” evidence of communal living adduced below, the court held that the defendant fell short of that burden:
[The defendant] provided scant evidence to support the inference that he had a reasonable expectation of privacy in the common hallway at [the rooming house]. He did not endeavor to show circumstances regarding his relationship with the other renters, their particular use of the common areas, or any other factor that might conceivably form the basis of a conclusion that the officers’ presence in the common hallway of [the rooming house] implicated [the defendant’s] reasonable privacy expectations.
Id. (emphasis supplied).[22]
The majority ignores Bedell in favor of three cases that are not especially useful. *343 The linchpin in that trio was that residents had to traverse common areas in order to get to shared kitchens and bathrooms, making their arrangements more like single-family homes. State v. Titus, 707 So.2d 706, 708 (Fla.1998); People v. Garriga, 189 A.D.2d 236, 596 N.Y.S.2d 25, 28 (N.Y.App.Div.1993); see Reardon v. Wroan, 811 F.2d 1025, 1027 n. 2 (7th Cir.1987).[23] Indeed, in Titus, the Florida Supreme Court expressly limited its holding to common areas that linked such “inseparable features of their ‘home’
Interior hallways in rooming houses are protected only by virtue of linking such traditional rooms within the house — they provide rooming house residents with the only means of access to these rooms, and are an inseparable feature of their “home.” In other words, it is not any inherent nature of a hallway that controls, but rather what the hallway links (i.e., individual self-contained living units versus shared traditional living areas).
Titus, 707 So.2d at 711; see also Garriga, 596 N.Y.S.2d at 29 (“There is too, in our view, importance on another level in finding the common internal hallway area of a rooming house a private, as opposed to a public, place.... Clearly, it is economic necessity that requires those who live in such humble circumstances to dwell there. That they cannot afford to have their own kitchens and bathrooms, and hallway access thereto, does not render such areas ‘public.’ ”) (internal citations omitted).[24]
Here, Werra did not need to pass through common areas in order to access his kitchen or bathroom. Rather, the record is quite clear that Werra could — and regularly did — live autonomously in his own self-contained unit on the third floor. True, we do not know whether other units were similarly self-contained, but that is precisely the point: it was Werra’s burden to show, as the majority acknowledges, that tenants were “ ‘roommates in the same house,’ not simply co-tenants sharing certain common areas.” Ante at 332 (quoting Reardon, 811 F.2d at 1027 n. 2). By failing to put forward evidence concerning the living arrangements of other tenants and their particular use of common areas, Werra fell short of that burden. See, e.g., Bedell, 311 Fed.Appx. at 463.
The majority cobbles together several pieces of testimony that, I am told, compel a contrary conclusion. In my opinion, none withstands close scrutiny.
*344 First, drawing from Cicerano’s testimony, the majority reports that “unlike an apartment building in which tenants contract individually with the landlord, 63 Menlo Street was rented as a whole by Cicerano.” Ante at 333. In particular, the majority points to Cicerano’s description of 63 Menlo Street as “my house,” id. at 333; see also id. at 335 (“the residents at 63 Menlo Street were all living with Cicerano, in ‘his’ house, as part of a nontraditional single-'family’ household. As Cicerano put it, Werra ‘stayed at my house, he lived at my house.’ ”), and his testimony that, although all his tenants “pitched in,” Cicerano ultimately paid “most” of the rent. Id. at 333; see also id. at 335 (faulting the district court for not addressing “the facts showing that 63 Menlo Street was operated as a single household, including Cicerano’s notable testimony that he paid most of the rent”). Thus, according to my colleagues, “the tenants shared the house in much the same way as would a traditional family.” Id. at 334.
But however informal it may have been, the relationship between Cicerano and his tenants was less familial than the majority’s characterization suggests. Tenants were assigned rooms or apartments; at least some of those could be locked to the exclusion of other tenants; and at least one — Werra’s third-floor apartment — was also fully self-contained. They paid rent to Cicerano in order to occupy those spaces. And, as far as the record shows, they were not related to Cicerano or necessarily on close terms with him. Cicerano testified, for instance, that he did not know the last name of one of his tenants. On this record, the majority’s analogy to a “traditional family” home is, in my opinion, rather inapt.
Moreover, multi-unit homes were common in the area. Detective Schaaf testified, for example, that there were “many multifamily homes” in the vicinity of 63 Menlo Street. Based on Det. Schaaf s testimony, the record description of Werra’s self-contained unit, and Werra’s failure to adduce evidence concerning the living arraignments of his co-tenants, I think it is unreasonable to infer — as the majority does — that 63 Menlo Street was the anomaly here. See, e.g., United States v. Cook, 277 F.3d 82, 84 (1st Cir.2002) (when reviewing suppression denials, we must “construe the record in the light most favorable to the district court’s ruling, drawing all reasonable inferences in the government’s favor”).
And although Cicerano testified that he paid “most” of the monthly rent, he never explained what he meant.[25] He could have meant several things: he could have meant, as the majority appears to believe, that he paid nearly all of the rent; or, equally plausible in my view, that he paid more than any other tenant but still less than half of the rent. See Webster’s Third New Int’l Dictionary 1474 (1993) (defining “most” as “the greatest amount or quantity” in addition to “the majority” of something). The latter, if true, would cut against the majority’s characterization of 63 Menlo Street. The salient point, however, is that Cicerano’s vague testimony is susceptible to different interpretations, and I see no basis for rewarding Werra— who lost his motion to suppress below— with the most favorable one. In fact, as noted, courts of appeals are supposed to do the very opposite. See, e.g., Cook, 277 F.3d at 84.
*345 Second, the majority refers to Werra’s testimony that “he had spent ‘[m]any nights’ sleeping on a couch in the living room on the first floor because ‘when I was up on the third floor, everybody wanted to come up on the third floor.’ ” Id. at 333; see also id. at 334 (“Werra’s co-tenants were undeterred by the door to the third floor when that space was ‘needed’ for their comfort and enjoyment. Werra behaved similarly, claiming alternative space in the house when the third floor was targeted by others.”).
The district court, however, disregarded Werra’s testimony in that respect. Favoring Cicerano’s version instead, the district court found both that Werra could exclude others from his apartment and only “sometimes” slept downstairs:
The third floor was Werra’s personal space and he had the ability to keep people out of that part of the building. In addition to renting the third floor, Werra sometimes — “not a lot but once in a while,” according to Cicerano— slept on the couch in the living room on the first floor, with Cicerano’s permission, because people would “party” on the third floor.
Werra, 2008 WL 4280035, at *1 (emphasis supplied). Those findings — amply supported in the record — were based on a credibility determination, albeit an implicit one, that we review only for clear error. United States v. Verdugo, 617 F.3d 565, 576 (1st Cir.2010); see also United States v. Espinoza, 490 F.3d 41, 46 (1st Cir.2007) (“credibility calls — with only rare exceptions — are the district court’s prerogative”); United States v. Zapata, 18 F.3d 971, 975 (1st Cir.1994) (appellate courts must “exhibit great respect for the presider’s opportunity to hear the testimony, observe the witnesses’ demeanor, and evaluate the facts at first hand”). The record suggests no reason whatsoever to question that determination.
The majority responds by asserting that, no matter whether the district court credited Cicerano or Werra, “the fact remains that it was an ordinary occurrence for others to use the third floor and for Werra to relocate to the living room.” Ante at 335 (emphasis supplied). According to the majority, that fact, along with Werra’s testimony that he moved some of his furniture into the living room, “shows a belief that he had a personal claim to the space.” Id. at 335. These assertions are perplexing. The first disregards the district court’s fact-finding, which I have block quoted (and emphasized) above, on that precise question.[26] Werra, 2008 WL 4280035, at *1. The second is beside the point. As discussed, Werra’s subjective “belief’ is meaningless unless “society is prepared to recognize [it] as objectively reasonable.” Rheault, 561 F.3d at 59. I doubt that moving one’s couch into another tenant’s living room, and then “sometimes” sleeping on it after obtaining permission (which was not always granted here), warrants societal recognition of a privacy interest. And even if one were to engage in that doubtful assumption, “the space” in question is the foyer, where Werra was stopped, not the living room. I discern no facts in the record that remotely suggest an objectively reasonable privacy interest in the foyer (or, for that matter, throughout the building at large).
*346 Third, the majority points to Cicerano’s testimony “that people would sometimes congregate in the kitchen,” ante at 334,[27] and to Werra’s testimony that, in addition to the bathroom in his third-floor unit, “bathrooms were located on the first and second floors.” Id. at 334. From these snippets, the majority declares that “the record shows that the tenants shared use of the first-floor kitchen and the second- and third-floor bathrooms.” Id. at 334.
In my view, that inference is at best highly questionable. As noted, Werra’s central theory is that the tenants of 63 Menlo Street lived communally. I think that it is telling, however, that Werra failed to adduce any direct evidence that he used a kitchen or bathroom other than his own. He or Cicerano — or any of the several co-tenants, none of whom Werra called — easily could have said so at the suppression hearing. The more reasonable inference to draw from the testimony as a whole is that Werra and others generally used the facilities that were assigned to them. See, e.g., Cook, 277 F.3d at 84. And moreover, evidence that tenants may have gathered sporadically in one of multiple kitchens provides no reasonable basis to believe that life at 63 Menlo Street was anything like the communal arrangements described in the cases relied on by the majority, in which all residents shared a single kitchen out of necessity. Titus, 707 So.2d at 708; Garriga, 596 N.Y.S.2d at 28; see Reardon, 811 F.2d at 1027 n. 2.
In sum, I would hold that Werra failed to establish an objectively reasonable expectation of privacy outside of his third-floor apartment. Without that showing, he cannot contest the officers’ entry into 63 Menlo Street. New York v. Class, 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); Rheault, 561 F.3d at 59.
II.
The above conclusion requires me to address the search and seizure of Werra’s person. See Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). I conclude that Det. Schaaf lawfully detained and patted Werra, on an objectively reasonable basis of officer safety, while he and Trooper Fries executed a valid arrest warrant.
Ultimate constitutional questions like these call for de novo review, Espinoza, 490 F.3d at 46 (“Legal conclusions, including ultimate constitutional determinations (such as the sufficiency of the facts found to support a conclusion that, for example, reasonable suspicion exists or a seizure occurred), engender de novo review.”), and that review is “not confined to a consideration of the grounds relied on by the district court.” United States v. Soule, 908 F.2d 1032, 1036 n. 7 (1st Cir.1990); see also United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir.2009) (“In the end, we will affirm the denial of a suppression motion if any reasonable view of the evidence supports it.”).
I begin with the relevant background, taken from the district court’s rescript. Detective Schaaf knew Cicerano “from his past encounters with law enforcement,” and when Cicerano opened the door Det. Schaaf immediately suspected that 63 Menlo Street had become a “drug house.” Werra, 2008 WL 4280035, at *1. After entering the building, Det. Schaaf instructed Cicerano to round up the tenants on the upper floors and bring them downstairs. *347 While individuals began to assemble in the foyer, Det. Schaaf “saw movement out of the corner of his eye.” Id. at *2. He “turned and saw Werra walking out of the living room towards him” with his hands “in his front pant pockets, ‘half in and half out’ and ‘moving slightly.’ ” Id. Detective Schaaf “observed a clip of a concealed pocket knife visible outside [Werra’s] front right pocket,” and promptly relieved Werra of the weapon. Id. At that point, Werra’s left hand, which remained in his other pocket, “was moving a little bit.” Id. Fearing that Werra might still be armed, Det. Schaaf conducted a pat frisk of Werra’s front left pocket. He felt a hard object that he recognized as a firearm, removed it from Werra’s pocket, and handed it to Trooper Fries. Detective Schaaf then placed Werra under arrest. A brief struggle ensued, after which Werra was subdued and taken into custody.
Based on these findings, which neither party contests, the district court determined that both the detention and frisk were reasonable. The court noted initially that the circumstances did not warrant a Terry stop because there was no reasonable basis to suspect that Werra was engaged in criminal activity. See Terry, 392 U.S. at 29, 88 S.Ct. 1868 (investigatory stop requires reasonable suspicion “that criminal activity may be afoot”). Nevertheless, it concluded that the officers lawfully detained Werra under Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (search warrant authorizes limited detention of occupants during search for contraband). Although the court recognized that Summers involved a search warrant, it reasoned that the logic of Summers applied equally to eases, like this one, where police enter a home in order to execute an arrest warrant. As for the pat frisk, the court concluded that the limited intrusion on Werra’s person was justified because Werra was visibly armed in a drug house suspected of harboring a fugitive. See Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Terry, 392 U.S. at 27, 88 S.Ct. 1868.
I think that the pat and frisk is uncontroversial, based largely on the reasons identified by the district court. The more interesting question, in my opinion, is the stop. A prototypical Terry stop takes place on the street. See, e.g., Terry, 392 U.S. at 12, 88 S.Ct. 1868 (dealing with “the myriad daily situations in which policemen and citizens confront each other on the street”). We have, however, applied the Terry doctrine to temporary detentions in and around the home, United States v. Beaudoin, 362 F.3d 60, 69-70 (1st Cir.2004) (summoning the defendant outside his motel room), vacated on other ground sub nom. Champagne v. United States, 543 U.S. 1102, 125 S.Ct. 1025, 160 L.Ed.2d 1009 (2005), and although the inquiry in our residential cases tends to focus on officer safety, as far as I can tell we have not formally abandoned the requirement that police articulate reasonable suspicion of criminal activity in order to justify an in-home stop. See, e.g., United States v. Parker, 549 F.3d 5, 8-9 (1st Cir.2008) (summoning the defendant outside his hotel room on reasonable suspicion of a felony); United States v. Romain, 393 F.3d 63, 75 (1st Cir.2004) (detaining the defendant in an apartment on reasonable suspicion that he had threatened the person who placed the 911 call).
But I see this case differently. Detective Schaaf and Trooper Fries entered a suspected drug house on the authority of a valid arrest warrant. During the execution of that warrant, they briefly detained a visibly armed occupant who approached them in a confined area where they were outnumbered at least two-to-one. In such circumstances, I believe that requiring a *348 showing of articulable criminal activity in order to justify a temporary detention would unreasonably jeopardize officer safety. Like the district court, I would apply the rule in Summers to situations, like this one, where temporary detentions are necessary for the police to execute an arrest warrant safely. And although the district court does not appear to have considered Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Edüd 276 (1990) (circumstances surrounding in-home execution of arrest warrant authorize a “protective sweep”), I think that the logic of Buie provides an additional basis for the same result.
I examine each below, beginning with Summers.
A.
In Summers, police encountered the defendant descending the front steps of his house as they were about to search it for drags. 452 U.S. at 693, 101 S.Ct. 2587. The officers requested his assistance in gaining entry and detained him while they performed the search. Id. They found drugs, arrested the defendant, and charged him with possession. Id. at 693— 94, 101 S.Ct. 2587. He filed a motion to suppress, which the state trial court granted; that decision was affirmed by divided panels of both the state intermediary and supreme appellate courts. Id. at 694, 101 S.Ct. 2587. The Supreme Court took the case and reversed.
Justice Stevens, writing for the majority, held that “a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.” Id. at 705,101 S.Ct. 2587. He reasoned that a “neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there.” Id. at 701,101 S.Ct. 2587. A brief detention in that circumstance, he continued, was “less intrusive than the search itself,” id., was unlikely to be “exploited by the officer or unduly prolonged,” id. at 702, 101 S.Ct. 2587, and “would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station.” Id.
The defendant’s brief detention was also supported by several law enforcement interests. First, Justice Stevens observed that law enforcement had an obvious interest in “preventing flight in the event that incriminating evidence is found.” Id. Second, less obvious but sometimes more important, was their interest in “minimizing the risk of harm to the officers” because “the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence.” Id. And third, they and others present had an interest in “the orderly completion of the search” because an occupant’s “self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.” Id. at 703, 101 S.Ct. 2587. All these, Justice Stevens concluded, further justified the defendant’s brief detention while officers performed the search.
Although we have not yet done so, other courts have applied the rule in Summers to cases involving the in-home execution of arrest warrants. United States v. Enslin, 327 F.3d 788, 797-98 (9th Cir.2003) (police ordered occupant to show hands during in-home execution of an arrest warrant for another occupant); State v. Valdez, 68 P.3d 1052, 1057-58 (Utah App.Ct.2003) (policed restrained occupant during in-home execution of an arrest warrant for another occupant); People v. Hannah, 51 *349 Cal.App.4th 1335, 1343-44, 59 Cal.Rptr.2d 806 (Cal.App.Ct.1996) (police ordered occupant to remain seated during in-home execution of an arrest warrant for another occupant); see Cherrington v. Skeeter, 344 F.3d 631, 638 (6th Cir.2003) (involving claims brought under § 1983); Anderson v. United States, 41 Fed.Appx. 506, 507 (2d Cir.2002) (Sotomayor, J., on panel) (involving claims under the Federal Tort Claims Act).
My review leads me to the same conclusion. Similar law enforcement interests are present in this context. Most importantly, brief detentions in such circumstances are justified because they reasonably minimize the risk of harm to officers and others present. Whether for the purpose of arresting a fugitive or searching for contraband, entering a suspected drug house is dangerous business. In those potentially volatile environments, officers must have the authority to briefly detain individuals who might be armed and dangerous, especially when those individuals, like Werra, are visibly armed. Other courts have permitted similar detentions when the threat to officer safety was far less obvious. See, e.g., Enslin, 327 F.3d at 797-98 (no visible weapons; police ordered occupant to show hands from beneath covers when he had just awakened from sleep); Valdez, 68 P.3d at 1057-58 (no visible weapons; police restrained occupant while he was sleeping because his hands were concealed); Hannah, 51 Cal.App.4th at 1343-44, 59 Cal.Rptr.2d 806 (no visible weapons; police ordered occupant to remain seated).
Moreover, such detentions prevent advanced warning of an impending arrest that might cause fugitives to hide or flee the premises. See Anderson, 41 Fed.Appx. at 507 (holding, in reliance on Summers, that police were justified in detaining occupants during in-home execution of an arrest warrant in light of “the relatively high likelihood that [they] would warn a possibly dangerous person of impending arrest, coupled with the relatively brief period of additional detention involved”). Indeed, such detentions might even facilitate an arrest by inducing detainees to assist the officers in locating a fugitive “to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.” Summers, 452 U.S. at 703, 101 S.Ct. 2587. Elements of both scenarios are on display in this case. Cicerano initially agreed to assist the officers by assembling the tenants downstairs, presumably based on his own self-interest in maintaining decorum in the building. When Cicerano went upstairs, however, he warned tenants who had warrants — including Jeanine Daley— to remain upstairs in order to avoid arrest. It was only after Det. Schaaf ascended the stairs, following his scuffle with Werra, that he finally apprehended Daley.[28]
Werra argues that the disconnect between a search warrant and an arrest warrant renders Summers inapplicable. His position is overstated. True, a search warrant gives the police a ready basis for determining that occupants of a residence subject to search may have done something wrong; an arrest warrant does not. But in my opinion the salient point in Summers was “the interposition of the magistrate’s determination of probable cause between the zealous officer and the citizen.” 452 U.S. at 704, 101 S.Ct. 2587. Of course, interposition is present whether *350 the warrant authorizes a search or an arrest. And, much like the search context, brief detentions in the arrest context are unlikely to be “exploited” or “unduly prolonged,” because the end goal is the apprehension of the individual identified in the arrest warrant, not the detention of that individual’s co-tenants. See id. at 702, 101 S.Ct. 2587. In any event, I would not necessarily apply Summers to all detentions in this context, but only those reasonably necessary to protect officer safety. So while the analogy may not be perfectly apt, I think that the distinction is ultimately less important than Werra claims.
B.
In Buie, police entered the defendant’s home in order to arrest him in connection with an armed robbery. 494 U.S. at 328, 110 S.Ct. 1093. As the officers fanned out through the first and second floors, one of them announced that he would “freeze” the basement so that no one could come up and catch them off guard. Id. The officer shouted into the basement ordering anyone down there to come out. The defendant soon emerged with hands raised. After he was arrested, another officer entered the basement “in case there was someone else” down there. Id. In the basement, the officer found a red jump suit that connected the defendant to the earlier robbery. The defendant’s motion to suppress the suit was denied; a jury later convicted him on the robbery charge. The state intermediary appellate court affirmed, but the state high court reversed on the ground that the suit should have been suppressed. Id. at 389, 110 S.Ct. 1093. On certiorari, the Supreme Court reversed.
Authorizing so-called protective sweeps, the Court stated that police may employ “a properly limited sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.” Id. at 337,110 S.Ct. 1093. It reasoned that an in-home arrest can pose a greater risk of danger than a typical on-the-street Terry encounter:
A Terry ... frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary’s “turf.” An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surrounding.
Id. at 332, 110 S.Ct. 1093. In those circumstances, the Court concluded, arresting officers may “take reasonable steps to ensure their safety during, and while making, the arrest,” id. at 334, 110 S.Ct. 1093, as long as those procedures were “aimed at protecting the arresting officers” and lasted “no longer than is necessary to dispel the reasonable suspicion of danger.” Id. at 335, 110 S.Ct. 1093.
We have extended Buie when necessary to protect officer safety. For example, we have authorized police to conduct protective sweeps in conjunction with the execution of search warrants, Drohan v. Vaughn, 176 F.3d 17, 22 (1st Cir.1999); United States v. Daoust, 916 F.2d 757, 759 (1st Cir.1990), and where the existence of exigent circumstances prompts the entry of police, United States v. Martins, 413 F.3d 139, 149-50 (1st Cir.2005). See also United States v. Lawlor, 406 F.3d 37, 41-42 (1st Cir.2005) (applying Buie to protec *351 tive sweep in house following arrest outside of the home).
Although our cases were within the search context, other courts have applied Buie’s rationale to seizures. In United States v. Maddox, for instance, the Tenth Circuit upheld the detention of a potentially dangerous individual during an in-home arrest. 388 F.3d 1356, 1362 (10th Cir. 2004). There, while police arrested a woman inside a mobile home, the defendant pulled into the mobile home’s driveway in a pick-up truck. Id. at 1359. An officer stationed outside saw the defendant reach under his seat; because the officer could not tell whether the defendant was placing or retrieving something under the seat, he interpreted the action as “an unknown threat” and instructed the defendant to remain in the vehicle. Id. The court of appeals agreed that the brief detention was lawful, reasoning that, like a protective sweep, a “protective detention” was an obvious and reasonable measure to ensure officer safety:
Because the ability to search for dangerous individuals provides little protection for officers unless it is accompanied by the ability to temporarily seize any dangerous individuals that are located during the search, we conclude that detaining potentially dangerous persons for the duration of the arrest qualifies as a “reasonable step[] to ensure the [officers’] safety.”
Id. (quoting Buie, 494 U.S. at 334, 110 S.Ct. 1093); accord State v. Ugalino, 107 Hawai’i 144, 111 P.3d 39, 48-49 (Haw.Ct. App.2005) (applying Buie to a protective detention during the in-home execution of an arrest warrant: “Even if the officers lacked a reasonable suspicion that [the defendant] was involved in criminal activity, they were justified in fearing that [he] would use a concealed weapon against them if they did not temporarily detain him and perform a pat-down search for weapons.”).
I would apply the logic of Maddox in this case. An objectively reasonable officer in the same situation as Det. Schaaf and Trooper Fries would have been concerned for her safety. Although the record does not indicate that their target, Daley, had a history of violence, they nevertheless entered a suspected drug house in order to arrest a fugitive on her “turf.” They were in a confined area where they were outnumbered at least two-to-one. And a man, whose hands were concealed in his pockets, approached them armed visibly with a knife. Werra may not have approached the officers in an overtly threatening manner, but the totality of the circumstances reasonably suggested a threat. In response to that threat, Det. Schaafs actions were correspondingly proportionate: he detained Werra only momentarily in order to remove the knife and performed a pat frisk limited in scope to Werra’s other pocket. These minimally invasive actions were “reasonable steps ... aimed at protecting the arresting officers” and lasted “no longer than [was] necessary to dispel the reasonable suspicion of danger.” Buie, 494 U.S. at 334-35, 110 S.Ct. 1093.
In sum, based on either Summers or Buie, or under the collective weight of both, I would hold that police have limited authority to detain an individual they encounter during an in-home execution of a valid arrest warrant when they reasonably suspect the individual might be armed and dangerous. In this case, because I believe Det. Schaaf and Trooper Fries acted reasonably under the circumstances, I would affirm.
III.
That is enough to affirm the district court’s thoughtful decision denying Wer *352 ra’s motion to suppress. But I will also briefly address the majority’s holding that the entry was illegal, because I am concerned about the holding’s practical consequences.
I begin, as before, with the district court’s findings. On their way to arrest Daley at her last known address, Det. Schaaf and Trooper Fries spoke with a confidential informant (“Cl”). Werra, 2008 WL 4280035, at *1. The Cl, whom the officers identified as “Christine,” had provided Det. Schaaf “with reliable information concerning the location of a suspect in the past.” Id. When asked about Daley’s whereabouts, the Cl responded that “Daley was staying at 63 Menlo Street” and that she “had seen Daley there recently.” [29] Id. Based on the Cl’s tip, and their suspicion that Daley — a known drug user — might well be staying at a “sober house” like 63 Menlo Street, the officers proceeded to that address instead. Id.; see also id. at *9 (“The tip that Daley was ‘staying at’ that address came from a previously reliable informant and was consistent with what Schaaf knew about both Daley’s drug abuse and the building at 63 Menlo Street.”). To increase chances that Daley would be home, they arrived “relatively early in the morning, at approximately 10:00 a.m.” Id. at *10.
Although the question is a close one, these findings satisfy Payton’s two-prong inquiry that police armed with a valid arrest warrant may “enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.” Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); United States v. Graham, 553 F.3d 6, 12 (1st Cir.2009) (recognizing that Payton is satisfied when “the police ‘reasonably believed’ prior to entry that [the suspect] (1) resided at the apartment and (2) would be present”).[30]
As for Payton’s first prong, the officers had “reason to believe” that Daley resided at 63 Menlo Street. Detective Schaaf and Trooper Fries obtained information that Daley was “staying at 63 Menlo Street” during a face-to-face encounter with a reliable Cl who was personally known to them. It was specific and based on the Cl’s first-hand observations. And the Cl presumably knew that, if that information was false, the officers could find her and hold her accountable. We have not required police to corroborate tips of this ilk in comparable circumstances. Cf. Ro *353 main, 393 F.3d at 73 (no independent corroboration required in order for police to make Terry determinations following face-to-face encounter with informant).
Moreover, other courts have held that Payton’s first prong was satisfied based exclusively on uncorroborated information gleaned from reliable CIs. For example, in United States v. Gay, the Tenth Circuit held that Payton’s first prong was satisfied when police engaged in a “face-to-face discussion” -with a Cl, who told them “the location of the residence based on personal knowledge,” and “presumably remained accountable if the tip was fabricated.” 240 F.3d 1222, 1224-25, 1227 (10th Cir.2001). Here, Daley’s history of drug abuse, along with the officers’ familiarity with Cicerano and 63 Menlo Street’s reputation, gave the officers at least some additional indicia that the Cl’s information was likely correct.[31]
As for Payton’s second prong, the officers had “reason to believe” that Daley would be present when they entered. In United States v. Hayes, a case that bears an uncanny resemblance to this one, the Seventh Circuit held that a 10:00 a.m. weekday entry easily satisfied Payton’s second prong. 209 Fed.Appx. 548, 551 (7th Cir.2006). There, the court pointed to a tip from the building’s caretaker that the defendant had been there “recently” and to the defendant’s history of drug abuse. Id. (observing that the defendant was “an unemployed drug addict with no car”); see also Valdez v. McPheters, 172 F.3d 1220, 1230 (10th Cir.1999) (noontime entry on weekday reasonable in part because the defendant “sometimes abused drugs”).
Similarly, here: the officers entered 63 Menlo Street at 10:00 a.m. on a weekday based on a tip from a reliable Cl who had seen Daley there “recently” and their knowledge that she had a history of drug abuse. Considering also that Daley was a fugitive, see El Bey v. Roop, 530 F.3d 407, 418 (6th Cir.2008) (the defendant’s “fugitive status also increased the likelihood that he might be at home during business hours”), the officers could reasonably assume that she was at home when they entered. See generally 3 LaFave, Search & Seizure § 6.1 (collecting cases; stating, “in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there”).[32]
*354 The prompt execution of arrest warrants serves an important governmental interest. Armed with new and reliable information about a suspect’s whereabouts, police should be able to respond rapidly. This is especially true with respect to fugitives, who often take steps to avoid apprehension. In this case, requiring the police to delay apprehension in order to verify information they obtained from a reliable Cl disserves that interest and upsets the balance Payton sought to strike.
I respectfully dissent.

. Accord United States v. Mendoza, 281 F.3d 712, 715 (8th Cir.2002) (rejecting argument *343 that defendant had privacy interest in vestibule of two-stoiy duplex based on his bald assertion that he, "his children, girlfriend, and her children ... treated the upper unit, the lower unit, and the vestibule as communal space”) (internal quotation marks omitted).

. Reardon is distinguishable for the additional reason that the Seventh Circuit relied on the unique character of a fraternity, which it said was "intended to be something of an exclusive living arrangement with the goal of maximizing the privacy of its affairs.” 811 F.2d at 1027 n. 2. No such showing has been made in this case.

. I reserve judgment on whether the majority’s cases — all nonbinding, of course — were decided correctly. My point here is only that they are inapposite under the facts found by the district court. Other courts that have considered the question head-on have held that a rooming house resident's privacy interests begin at the entrance to his or her room — not the entrance to the entire rooming house. E.g. United States v. Anderson, 533 F.2d 1210, 1214 (D.C.Cir.1976) ("appellant’s constitutionally protected privacy interest began at the door to room eight rather than at the door to the entire rooming house”); accord State v. Kechrid, 822 S.W.2d 552, 554-55 (Mo.App.Ct.1992) (no privacy interest in hallway of boarding house where residents shared a kitchen and bathroom); United States v. Williams, No. 05-CR-191, 2007 WL 4302971, at *4 (D.Conn. Dec. 6, 2007) (no privacy interest in third-floor closet of rooming house where residents shared bathrooms).

. On cross-examination, the government sought to have Cicerano quantify the amount of rent his tenants paid. Cicerano responded, without elaboration, "[j]ust what [they] could.”

. The majority's fallback position is that, even if the district court impliedly credited Cicerano’s account of how often Werra slept downstairs, "there is no basis for concluding that the court generally disbelieved Werra and hence we should disregard all of his testimony.” Ante at 335 n.13. I ask only that we defer to the district court's credibility determination, as our precedent requires, on this specific issue. In my opinion, the majority has not done so.

. The majority paraphrases Cicerano's testimony on cross-examination where the government asked whether "people would sometimes congregate in the [first-floor] kitchen.” Cicerano responded "Yeah,” with no elaboration other than to say that such gatherings had not occurred recently in the wake of his mother’s death.

. I do not mean to suggest that police had authority to detain Cicerano. My point is only that briefly detaining individuals who might be armed and dangerous, like Werra, would prevent them from frustrating the execution of an arrest warrant, and, in some situations, might even facilitate apprehension.

. The majority questions but does not directly challenge the district court's finding that the Cl told the officers that Daley was “staying” at 63 Menlo Street. Ante at 329 n.1, 340 n.20. In light of the imposing standard that our case law sets, Espinoza, 490 F.3d at 46 ("A finding is clearly erroneous only when, upon a careful review of the record, a court is left with a ‘definite and firm conviction that a mistake has been committed.' ” (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948))), the majority properly left that finding intact.

. In my view there is no serious question that the “reason to believe” standard is satisfied by something less than probable cause. That is the clear implication of our cases, see Graham, 553 F.3d at 12-14; see also United States v. Weems, 322 F.3d 18, 22 (1st Cir.2003), and the position of every court of appeals, with one exception, that has considered the question, e.g. United States v. Thomas, 429 F.3d 282, 286 (D.C.Cir.2005) ("the Supreme Court in Payton used a phrase other than 'probable cause’ because it meant something other than ‘probable cause' ”); see generally 3 Wayne R. LaFave, Search & Seizure § 6.1 (4th ed. 2007) (collecting cases; stating, "it is generally accepted that the Payton 'reason to believe' requirement ... involves something less than the traditional probable cause standard”). But see United States v. Gorman, 314 F.3d 1105, 1115 (9th Cir.2002). Against that backdrop, I see no point in withholding a clear statement of our standard, and thus to propagate uncertainty in future cases.

. The majority says that Gay is distinguishable because, there, the Cl “accompanied officers to that location and told them the suspect was 'presently in his home.' ” Ante at 340 n.19 (quoting Gay, 240 F.3d at 1225). That is, of course, an accurate description of the facts in Gay. But the Payton test has two prongs, and each requires separate analysis. Gay holds, directly contrary to the majority’s holding here, that Payton’s first prong is satisfied based exclusively on an uncorroborated tip from a CI. Gay, 240 F.3d at 1227. The fact that I rely on other authority concerning Payton’s second prong — discussed below — is quite beside the point.

. The majority asserts that Hayes and other so-called time-of-day precedents are distinguishable because, in those cases, "there was no serious question that the location of the arrest was where the defendant lived,” ante at 339 (emphasis supplied), and, similarly, "the location of the suspect’s residence was well established.,” id. at 340 n.19 (emphasis supplied). Again, the majority improperly conflates Payton's two prongs. See supra note 31. In any event, I am not aware of any case that requires the government to prove residency beyond "serious question,” or show that a suspect's residence is "well established,” in order for it to rely on the time of day as a basis for believing the suspect is at home. Rather, at the risk of repetition, the test is "reason to believe.” Payton, 445 U.S. at 603, 100 S.Ct. 1371; Graham, 553 F.3d at 13 ("the police need not possess such rock-solid indicators of residence in order to form a 'reasonable belief that a suspect resides at a given place”). I reject the suggestion that more is required.